STATE ex rel. vs. ELISHA BAXTER, Governor.

CONTESTED ELECTIONS: *Who is to try contest for office of Governor.*

The attorney general presented an information upon the relation of Joseph Brooks, alleging that Elisha Baxter, without any legal warrant, grant or right whatever, etc., held and usurped the office of governor, and moved the court for a writ of *quo warranto*. On objection to the filing of the application, and issuance of the writ: *Held*, that under our constitution, the determination of the question as to whether a person exercising the office of governor has been duly elected or not is vested exclusively in the general assembly of the state, and neither this nor any other state court has jurisdiction to try a suit in relation to such contest, be the mode or form what it may, whether at the suit of the attorney general, or on the relation of a claimant through him, or by an individual alone claiming a right to the office.

PETITION for *Quo Warranto.*

State ex rel. vs. Elisha Baxter, Governor.

*T. D. W. Yonley*, Attorney General, and *W. G. Whipple* and *M. W. Benjamin*, for petitioner.

*E. H. English* and *F. W. Compton*, for defendant.

GREGG, J.   T. D. W. Yonley, as the attorney general for the state, has presented to the court an information, upon the relation of Joseph Brooks, and alleges therein that Elisha Baxter, without any legal warrant, grant or right whatsoever, hath for four months and more held, used and executed the office of governor of the state, and that he claims to be the governor of said state, and for said time has enjoyed all the liberties, privileges and franchises of that office, but that the same has been usurped and held without right, etc., and he moves the court for a writ of *quo warranto* against said Baxter.

The counsel for Mr. Baxter objected to the filing of the application and the issuance of the writ.   Counsel then asked leave to argue the case, and we patiently heard them for two days of long sitting, in which arguments, authorities that had required much time to collect and arrange, were read and commented upon, and the merits of the case, so far as the jurisdiction of the court and its power to determine the matters in controversy, were, on each side well presented.

For the last few years no question has more earnestly attracted the attention of this court than that of *quo warranto* proceedings.   We had many days of excitement and earnest discussion in the case of the *State v. Johnson*, reported in 26 Ark., 281, and for weeks before this proceeding was instituted, our attention was called to it by the wrangling of the political papers of the states, besides, other important cases have been argued before us.

The attorney general announced to the court that if the court were of the opinion the information was objectionable, because made upon the relation of Joseph Brooks, they should

State ex rel. vs. Elisha Baxter, Governor.

strike out that name, but in frankness he must state that, by replication, the name would again be brought before the court as the relator of the person elected. He made no motion to strike Mr. Brooks' name from the information.

The principal argument of the counsel of Mr. Baxter was not directed to the form of the information, or the fact that Mr. Brooks was the relator, but to the jurisdiction of the court, and its authority to determine the proposed issue, whether or not Mr. Baxter was the elected and qualified governor of Arkansas, and these arguments were responded to at length by counsel for the state, presenting the matter as if upon demurrer to the information, and assuming that if the information, upon its face, did not show facts sufficient to confer jurisdiction, the court would not entertain it, or issue the writ, and upon this view the case has been considered.

If the information is insufficient upon its face, it is not irregular, upon objection made, to decline entertaining it and refuse the writ, nor does the attorney general insist upon the filing unless the writ can issue thereon.

It must be borne in mind that our legal rights depend upon the laws, and the tribunals that must determine and enforce them.

The will of the people, as enacted in the organic law, or other laws not inconsistent with the constitution, is the rule by which all must be governed, and there is nothing in the argument that the courts alone can determine disputed rights, and that they alone possess all the judicial power of the state. The will of the people directs where such power shall be, and it may be vested in executive officers or in legislators, if the people in convention so ordain. Perhaps in every state in this Union, a branch of the legislature, for some purposes, sits and determines, as a court, and it is too well known to refer to the instances wherein states constituted their senate a court of last resort.

For most purposes, under our forms of government, it has been considered best to separate legislative, executive and judicial powers; but whenever the people, the sovereign power of the state, determine otherwise and engraft it in their organic law, the one department may, as well as any other, sit in judgment upon individual claims and rights.

Hence, there was just the same power in the people, when assembled by their delegates in convention, to give the power of settling any controversy that might arise, to one branch of the government as another; and if they conferred the power on the legislature, and not the courts, to determine who is the governor elected by the people, that body must execute the trust, and their authority cannot be revoked until the people again meet in convention and exercise their sovereign power.

It has been urged that the legislature may not exert their power against one unlawfully in place or incompetent to hold such position, or that legislators may become corrupt and count in one not elected, and thereby a mere usurper would exercise these high prerogatives without having received a majority of the electors' votes.

It is true that these are matters of great magnitude, and, like most others that affect the very elements of our government, were legitimate for consideration and determination by the sovereignty of the state, when in convention assembled; and as it is important to the people who shall govern a state, it becomes likewise important to them, in case of a contest, who shall decide who is the proper governor, and hence that question should have been discussed before the convention, and that body, as they did, should have declared how so important an issue should be adjudicated. And while it is not to be presumed that either the legislature or the courts will ever become corrupt, through partisan prejudice, pecuniary consideration or otherwise, yet in matters so vital

it may have been proper to consider of remote possibilities, and fortify wherever danger could approach; and may the convention not have reasoned, as the courts compose the department most remote from the people, and are made up of but few judges, whose terms are for several years, that the offer of greater promotion, the power of personal influence, or even the love of mammon, more possibly, might produce some bias with the few so distant from the power that created them a court, than with the large numbers forming the general assembly, all of whom are directly responsible to the people for the trust reposed in them, and a large majority of whom must come before their constituents each session, where they must expect to be held responsible for their official acts.

The argument is pressed that if the governor be a usurper and his seat not contested before the legislature, the people are governed by a mere trespasser, and if the attorney general cannot sue out a *quo warranto* and this court decide who is elected, there is no remedy, and that "rights so dear, rights so sacred to the people," etc., never can be thus violated in a just government and no redress offered, etc.

This is but changing the form of the sophism, and is answered by the same solution. The question is, In whom shall so great a trust be reposed? If in the attorney general and a few judges, and they should not execute it, would not the same result be produced? Shall the governor of the state, the head of the executive department, be subject to removal by the courts of the state; shall these departments be coordinate, coequal in strength and dignity; or shall the officers of one have power to remove the incumbent of the other, and thus dictate his policy, or hold the executive at their mercy? These were questions when the elements and theory of our government were under discussion. It is said that the court could only turn one out who was not properly elected

State ex rel. vs. Elisha Baxter, Governor.

or qualified; neither can a general assembly count one in, or keep one in if not legally elected; and both are equally presumed to be honest and to perform their whole duty.

If the court, on the motion of the attorney general, has power to declare a governor out of office because he was not properly elected or qualified, then if it were possible for the attorney general and a majority of the court to be improperly controlled, no governor could hold his position unless the court approved his policy. If the power exists to turn any one out, no incumbent can withstand the judgment. If the court can judge, it may misjudge.

It seems to us one of the elementary principles of our government that the departments should be co-ordinate and co-equal, and while the courts of the state move forward in the discharge of their duties, free from executive policy and beyond executive control, the governor is clothed with a manhood that places him above the whims, and stronger than any prejudice that could possibly exist in a court, and leaves his position to those who, under the constitution, are to designate the proper incumbent, and who are to try him for crimes or misdemeanors in office, and all the presumptions of integrity that can and should weigh in favor of a court must be allowed in favor of the representative men of the people.

Sec. 19, art. VI of the Constitution of 1868, is as follows: "The returns of every election for governor, lieutenant governor, secretary of state, treasurer, auditor, attorney general, and superintendent of public instruction, shall be sealed up and transmitted to the seat of government by the returning officers, and directed to the presiding officer of the senate, who, during the first week of the session, shall open and publish the same in presence of the members then assembled. The person having the highest number of votes shall be declared elected, but if two or more shall have the highest and

equal number of votes for the same office, one of them shall be chosen by joint vote of both houses. Contested elections shall likewise be determined by both houses of the general assembly in such manner as is or may hereafter be prescribed by law."

Here the whole question is settled; the manner of filling the executive chair is prescribed; the time of elections (sec. 3, art. XV) is fixed; the manner of voting (sec. 1, art. VIII); how the returns shall be inclosed; to whom transmitted; how and where they shall be published; how the result shall be declared, and if aspirants have the same vote, how one of them shall be chosen, and if the election is contested, how it shall be determined; and in this it seems they intended to cover the entire ground, and to dictate the mode of determining who shall be the executive, and thus fixing the tribunal to try this issue, and no where intimating that the high prerogative of deciding this question should belong to any other tribunal, carries to our mind the conviction that it was intended to be exclusive.

The magnitude of the court shows the importance the convention attached to the issue. They declare that contested elections *shall be determined by both houses* of the general assembly, and the manner of proceeding is regulated by the acts of the legislature, and it may be observed that this provision in the constitution does not limit the right of contest; it is not given exclusively to a rival candidate, nor to a prescribed number of voters, nor to the people at large, or any particular officer as the representative of the people, but the mode of contest and trial of the rights of the claimant is to be as the legislature have or may direct by law. They are to say who may contest, and how proceedings are to be brought before them.

It is further argued that in the absence of exclusive language, the higher courts are not inhibited; that their general

jurisdiction empowers them to hear and determine this question.

This does not necessarily follow. The courts may be excluded by implication; by language showing that some other tribunal is assigned that function.

Sec. 14 of art. V declares that "each house shall choose its own officers, determine the rules of its proceedings, judge of the qualifications, election and return of its members, and may, with the concurrence of two-thirds of all the members elected, expel a member," etc. There is nothing exclusive in this language. It only provides a tribunal to determine who is entitled to an office as a member of the general assembly. There is nothing declaring that the superior courts of general jurisdiction shall not try and determine the rights of one claiming to be legally elected to either house; nothing declaring that such cases are exceptions to the power of the courts to issue writs of *mandamus* or *quo warranto*, and hear and determine the same, or to issue other proper process, under the practice of the state to bring parties before the courts and have issues tried, rights determined and a judgment of ouster where the incumbent was illegally holding. Yet we have heard no one go so far as to assume that any judicial officer or court has the right, by *quo warranto* or otherwise, to decide whether any one is or is not entitled to a seat in either house of the general assembly, and to the extent of each one's official power, the people are as much outraged to allow an illegal holding, as in the case of a governor. But these officers and the judges are members of different and coordinate departments of the state government, and a constitutional provision being made that a legislator's right to his seat shall be determined in their own department. And, in theory and principle, this right to sit as members should not be under the control of another department of the state government, and,

especially one remote from the people.   And it is quite clear
that the convention never intended that the courts should
have power to seat or unseat any member of the general as-
sembly, recognizing that as a coordinate and coequal depart-
ment of the state government.

If it is upon this theory that the members of the legislature
are not to be disturbed by the courts, are we not forcibly
brought to the conclusion that they are not to seat or unseat
the governor, who is the head of another coordinate depart-
ment?

Had the court the power, by *quo warranto*, to seat or un-
seat the governor, to seat or unseat the members of the gen-
eral assembly, simply by ruling that they had not been elect-
ed in strict conformity to law, does it not destroy all equality
of independence, of power and of dignity? and if it is possi-
ble for a majority of a court to corruptly enter into political
intrigue, would not the whole government of the state be dic-
tated by these few? — a thing not likely to occur, but a possi-
bility properly guarded.

If was said a court does not seat or unseat any one upon
*quo warranto*.  In the same argument it was said, after the
right had been determined, this court would issue a *mandamus*
against one wrongfully holding the records, papers, etc., be-
longing to the office.   Upon this reasoning, we are at a loss to
see wherein an executive is more independent.   What mat-
ters it to him whether he is at once adjudged to turn over his
office to another or decided out of office upon *quo warranto*,
and then by *mandamus* compelled to surrender all that apper-
tains to the office.

And when it is assumed that a court, by *quo warranto*, and
the legislature, upon a contest, may each decide whether or
not the incumbent received a majority of the legal votes, and
is or is not properly in office, a conflict of jurisdiction arises,

and the attempt to explain that away was but a feeble argument.

If the legislature should hear a contest and decide that " A." was governor, and had a majority of votes over the only contestant " B.," and upon *quo warranto*, the supreme court should find that " B." received a majority of the legal votes, or in other words, that " A." did not receive a majority of the votes, " A." would be adjudged in office by the one and out of office by the other, and a court could no more refuse a *mandamus* against a party wrongfully in possession of the books, etc., in one case than in the other, and if these two tribunals have equal rights, even as most strongly argued — one by contest between claimants, and the other by *quo warranto* in behalf of the state, it does not change the result. The leg isla te upon the contest determine that " A." had more legal votes than " B." and is elected; the court upon *quo warranto* determines that " A." did not have a majority and declare him out, and these tribunals being of equal dignity and power, the mandates of each must be obeyed. Thus governors may alternate as often as these august courts assemble, as neither has power over the other. Whichever sits the oftenest would fill the gubernatorial chair the longer time. Can any one, for a moment, suppose the framers of the constitution ever intended to have two tribunals of equal power and in no way in sympathy with each other, with no right of appeal and each independent of all other authority ? If it had not been so seriously controverted, we would have thought the mere statement would have shown an absurity in any government. No one can contemplate a government with two courts of last resort, both with equal power, and each superior to the head of the executive department — the one declaring a man in office as governor and the other declaring him out of office, and the people with no possible means of ascertaining who is their chief executive.

Much time has been consumed in discussing the writ of *quo warranto*, as used at common law, and in attempting to draw nice and learned distinctions between proceedings by *quo warranto* and proceedings upon information in the nature of *quo warranto* as practiced in most of the states, which proceedings are all without any substantial difference. Each is instituted against some one supposed to be illegally holding an office, and to test his rights, and whether the proceeding is in the name of the state alone, or in the name of the state upon the information of some one claiming the office, the object of the suit is to oust the incumbent that another may take his place, the result to the incumbent and the public is the same, and it seems more in keeping with the spirit and usage of the age to deal practically with substances, than to court attention by flirting with shadows.

The solution of the question before us depends upon our own constitution, and upon a fair construction of that instrument. We are of opinion that the right to determine who is the legally elected governor of the state belongs to another department, and not the courts, and it would be a useless expenditure of time to enter upon a treatise on *quo warranto*, its history, modifications, uses, etc.

Under this constitution, the determination of the question as to whether a person exercising the office of governor has been duly elected or not, is vested exclusively in the general assembly of the state, and neither this or any other state court has jurisdiction to try a suit in relation to such contest, be the mode or form what it may, whether at the suit of the attorney general, or on the relation of a claimant through him, or by an individual alone claiming a right to the office. Such issue should be made before the general assembly. It is their duty to decide, and no other tribunal can determine that ques tion.

We are of opinion this court has no jurisdiction to hear and determine a writ of *quo warranto* for the purpose of rendering a judgment of ouster against the chief executive of this state, and the right to file an information and issue a writ for that purpose is denied.