Robertson v. The State, ex rel. Smith.

No. 13,565.

## ROBERTSON v. THE STATE, EX REL. SMITH.

JURISDICTION.—*Judgment.*—Jurisdiction of the subject-matter and of the person is essential to the validity of all judicial judgments, and where there is no jurisdiction the court will not express an opinion upon the merits of the controversy.

SAME.—*Quo Warranto.*—*Office.*—*Civil Action.*—An information in the nature of a *quo warranto* to settle the title to a public office is a civil action, and, under section 312, R. S. 1881, must be filed in the county where the defendant has his last and usual place of residence.

SAME.—*Constitutional Law.*—*Lieutenant-Governor.*—*Contested Election.*—A claimant of the office of Lieutenant-Governor can not maintain an information in the nature of a *quo warranto* to settle the title to that office, as section 6 of article 5 of the Constitution vests exclusive jurisdiction of such controversies in the General Assembly. Per ELLIOTT, C. J., and NIBLACK and ZOLLARS, JJ., separate opinions, see pages 123, 115, 134, respectively. MITCHELL and HOWK, JJ., contra, see p. 88. Opinions on petition for a rehearing by ELLIOTT, C. J., and NIBLACK, J., see pages 151, 153, respectively.

From the Marion Circuit Court.

*L. T. Michener,* Attorney General, *B. Harrison, W. H. H. Miller* and *J. B. Elam,* for appellant.

*D. Turpie, J. B. Brown* and *C. Byfield,* for appellee.

ELLIOTT, C. J.—On the 12th day of January, 1887, the relator, Alonzo G. Smith, filed an information against the appellant, praying an injunction against him restraining him "from intruding, or attempting to intrude, himself into the office of Lieutenant-Governor," and for a judgment of ouster, "excluding him" from that office.

The relator's information alleges, that, on the 4th day of November, 1884, the relator was duly elected a member of the Senate of the General Assembly of the State of Indiana; that he duly qualified, and that on the 13th day of April, 1885, he was chosen President of the Senate ; that he accepted the office, and entered on the discharge of its duties; that upon the assembling of the Senate in January, 1887, he was re-elected President of that body, and was in possession of that office at the time the information was filed. It is also alleged

that Mahlon D. Manson was elected to the office of Lieuten-ant-Governor in November, 1884, and that, having qualified, he held that office until July, 1886, when he vacated it by accepting a Federal office ; that, on the 2d day of November, 1886, at the general election then held, a majority of the voters of the State, assuming that a vacancy existed in the office of Lieutenant-Governor, were procured to vote for the respondent for that office ; that returns of the vote, regular in form, were made by the proper officers ; that such returns were duly certified to the secretary of state, and that certified statements of the vote were duly delivered to the Speaker of the House of Representatives.    It is further alleged, that, on the 10th day of January, 1887, the Speaker of the House of Representatives opened and published the returns in the pres-ence of the members of the House of Representatives, the Senate not being present, nor in session at the time ; that the Speaker declared that the respondent had received a majority of the votes cast at the election, and had been duly elected Lieutenant-Governor; that the respondent thereupon took the oath of office, and unlawfully intruded into the office by attempting to exercise its functions and duties, and that the Speaker of the House recognized him as the Lieutenant-Gov-ernor of the State.    The information also avers that the re-spondent claims the right to exercise the functions of the office of the President of the Senate, and is unlawfully inter-fering with the rights of the relator as such officer, and that the Senate, by a majority of its members, supports the claim of the relator to be the presiding officer, while the House of Representatives, by a majority of its members, sustains the claim of the respondent.

Summons was issued and served on the appellant, and a temporary restraining order was granted enjoining him from attempting to perform any of the duties of the office of Presi-dent of the Senate.    From this order the appellant appeals.

On the 13th day of January, 1887, the appellant entered a special appearance, and filed a verified plea denying the ju-

risdiction of the court, alleging in his plea that he had never been a resident or inhabitant of Marion county, but was, and had been for more than twenty years, a resident and citizen of the county of Allen. The appellee demurred to this plea, and his demurrer was sustained.

The question at the threshold is this: Had the circuit court jurisdiction to hear and determine the cause? If that court had no power over the cause, this court, of course, has none.

Two things are absolutely essential to the power of a court to decide a legal controversy, jurisdiction of the subject-matter and jurisdiction of the person. Both must exist; otherwise it is the imperative duty of the court to decline to do more than ascertain and declare that it has no power to examine or decide the merits of the controversy. Authors and courts agree upon this rudimentary principle of law. Neither in reason nor upon authority can there be a doubt as to its soundness. Power is essential to the validity of every act, judicial, legislative or executive. Where there is no power to hear and determine there can be no judicial decision. Expressions of individual opinion there may be, but a judicial judgment there can not be. A judicial judgment is the product of power, the power of the law, and is not the mere expression of the individual opinion of a judge.

The question is purely and intrinsically one of power, for the jurisdiction of a court consists solely in its power to hear and determine the causes brought to its bar. If jurisdiction does not exist, power is absent, and if power is lacking, an expression of opinion upon any other than a jurisdictional question, although judicial in form, is simply the opinion of its author, valuable it may possibly be as an argument, but effective as the opinion of the court, it is not.

"Jurisdiction," says a recent writer, "is the right to pronounce judgment acquired through due process of law." Herman Estop. and Res Judicata, section 69. At another place this writer says: "Jurisdiction is authority to hear and

determine." *Ibid.*, section 73. Again, speaking of the court, he says: "It must act judicially in all things, and can not then transcend the power conferred by the law." *Ibid.* In *Mills* v. *Commonwealth*, 13 Pa. St. 627, the court said: "Jurisdiction in courts is the power and authority to declare the law. The very word in its origin imports as much. It is derived from *juris* and *dico*. I speak by the law." Chief Justice SHAW said: "To have jurisdiction is to have power to inquire into the fact," and "to apply the law." *Hopkins* v. *Commonwealth*, 3 Met. 460. Chief Justice MARSHALL, speaking upon a kindred subject, said: "Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are the mere instruments of the law, and can will nothing." *Osborn* v. *U. S. Bank*, 9 Wheat. 738, 866. *In re School-Law Manual*, 4 Atl. Rep. 878, the Supreme Court of New Hampshire declared that where there was no jurisdiction, it was not only the duty of the court not to express an opinion, but it was its duty not to have an opinion on the merits of the cause. The Supreme Court of Texas, in *Withers* v. *Patterson*, 27 Texas, 491, said: "The jurisdiction of a court means, the power or authority which is conferred upon a court, by the Constitution and laws, to hear and determine causes between parties, and to carry its judgments into effect."

These are a few, only, of the many statements that abound in the books and reports and declare, what all must concede to be, the law of the land. Accepting these statements as correct, then, the conclusion must be, that where there is no jurisdiction there is no power. No consideration can be imagined, nor reason conceived, which will justify a court in assuming to pronounce a judgment where it has neither the right nor the power to hear or decide. It is only where courts can speak by the law, that they can rightfully speak at all.

An expression of opinion by a judicial tribunal, where it has no power to speak by the law, is utterly devoid of force. A decision without jurisdiction is a judgment only in form,

for it is absolutely and everywhere void. The author from whom we have quoted says: " If a court has no jurisdiction its decision is a nullity, and it matters not what facts it finds, or what questions it decides—in fact they are all nullities. If without jurisdiction it can not adjudicate the real merits of the case, it can not adjudicate any other question, whether it be introductory, incidental, or collateral." Herman Estop., etc., section 68. Another author says: " Where there is no jurisdiction, it does not belong to the proper functions of a court to give an opinion upon a matter submitted to them, for the guidance of parties or inferior tribunals. * * * * The whole business of a court is confined to giving decisions in cases properly before it." Wells Jurisdiction, 10.

In *Elliott* v. *Peirsol*, 1 Peters, 328, the Supreme Court of the United States said, in speaking of a court: " But if it act without authority, its judgments and orders are regarded as nullities." Our own court has decisively affirmed this elementary doctrine. *Smith* v. *Myers*, *ante*, p. 1.

The only course which a court can rightfully pursue is to decline to speak in all cases where it can not speak by the law. It is not a matter of choice; it is a matter of duty. The duty is as solemn and imperative as any one among all the grave duties that rest upon the courts of the country. Nor ought the courts to give opinions which are in form judgments, but in reality mere phantomatic resemblances, since, in more ways than one, such a course is productive of evil.

To the judicial department, as the most conservative of all the co-ordinate branches of the government, is entrusted the high duty of declaring and enforcing the law as it exists, and upon the officers of that department rests, more strongly than upon the officers of the other departments, the solemn obligation to unwaveringly abide by the established principles of law. A great and important part of the duty of the courts is to compel citizens and officers to obey the rules of law, and they can not, upon any imaginable ground, be themselves excused for violating those principles. It is the plain and

solemn duty of the courts to apply to themselves the rules which they enforce against others. Courts, most of all the instruments of the law, should sternly refuse to transgress its rules. It is an established principle of law, long settled and firmly maintained, that a court will not decide any question affecting the merits of a case over which it has no jurisdiction, and no court can, without a plain and inexcusable breach of duty, violate that principle. No one thing in all jurisprudence can be of higher importance than that the judiciary should inflexibly adhere to the law as it comes from the hands of the law-makers.

The question upon the facts stated in the appellant's plea is, whether there was any jurisdiction in the circuit court over the person of the appellant's person? not whether there was a defect in its process, or an irregularity in the service of its writs? There is no middle ground; there is either complete jurisdiction, or an utter want of jurisdiction. If, upon the facts stated in the plea, the law is that the appellant may be sued in Marion county, there is plenary jurisdiction. If the law is that he can not be there sued, then there is an absolute want of power to proceed a single step against him. It is either power or no power. The court can not look beyond or outside of the record, and on the record the question is, was there any jurisdiction at all?

It is enough for the decision of this case to affirm that there was no jurisdiction of the person of the appellant. It is not necessary, nor, indeed, proper, to decide any other questions than those of jurisdiction. The want of jurisdiction of the person is fatal to the right to go further into the cause. It is an elementary rule, that, without jurisdiction, there is no validity or vitality in any judgment, for, to give the slightest vitality to the judgment, there " must be jurisdiction of the cause and of the person." Herman Estop., etc., section 54. As there was no jurisdiction of the person, this cause can not, in any event, go back to the court from which it came for trial, but it goes back there only to be cast out.

Jurisdiction of the person of the appellant could only have been acquired in an action brought in the county of Allen, where he resided.

Section 312, R. S. 1881, governs this case, for it does not fall within the provisions of any other section. That section reads thus: "In all other cases, the action shall be commenced in the county where the defendants, or one of them, has his usual place of residence." This language is broad and comprehensive in its scope, and mandatory in its effect. It is the positive command of the law that all actions, except those otherwise provided for, shall be brought in the county where the defendant resides, and there is no authority to bring them elsewhere. It is not within the power of the court to create an exception. That would be judicial legislation, and judicial legislation is always odious, for legislation by the courts is usurpation. There is no escape from the command of the statute, and it is the duty of the courts to enforce it; they have no discretion to change it, nor have they power to take a case out of its operation. They must apply the law, as it is written in section 312, to all cases for which a different provision has not been made by the Legislature. If the law is faulty the Legislature, and not the courts, must amend it, for the courts have no authority to change a line or a word, since there is neither ambiguity nor obscurity. Section 1132 does not impair the force or effect of the section under immediate mention. The provision of section 1132 is, that an information may be filed by the prosecuting attorney of the circuit court "in the proper county," and "the proper county" can only be ascertained by exploring the statute. It is to the law, and to the law alone, that we can look to ascertain what is "the proper county," and the law informs us that "the proper county" is the county of the defendant's usual residence. The "proper county" can only be the county where the law authorizes actions to be instituted, for no other county can with accuracy or propriety be said to be "the proper county."

Our cases have uniformly held that all actions, except those for which express provision is made, must be brought in the county where the defendant resides. A forcible example is supplied by the case of *State* v. *White Water, etc., Co.*, 8 Ind. 320, which was an action to compel, by mandate, the rebuilding of a bridge in Dearborn county. The court held that the action must be brought in Fayette county, where the defendant resided, saying, among other things: "But it is assumed that the present action is local in its nature, and must be brought in the county where the duty sought to be enforced is to be performed. The code points out and defines the subject-matter of all the actions which must be instituted in the county in which the subject of the action, or some part thereof, is situated. But the case at bar does not seem to be within the definition." *Hawley* v. *State, ex rel.*, 69 Ind. 98, strongly enforces the same general doctrine. That was a prosecution for bastardy, and it was held that it must be instituted in the county where the defendant resided, the court saying: "Such proceedings, being transitory in their character, must, under the code, be commenced in the county in which the defendant resides when he is a resident of the State."

In other cases the court has asserted the policy of the statute to be, what, indeed, its language plainly imports, to require all actions, not expressly otherwise provided for, to be brought in the county where the defendant resides. *Hodson* v. *Warner*, 60 Ind. 214; *Boorum* v. *Ray*, 72 Ind. 151; *Robbins* v. *Alley*, 38 Ind. 553; *Ewing* v. *Ewing*, 24 Ind. 468; *Michael* v. *Thomas*, 24 Ind. 72; *McCauley* v. *Murdock*, 97 Ind. 229; *State, ex rel.*, v. *Board, etc.*, 49 Ind. 457; *Coleman* v. *Lyman*, 42 Ind. 289.

It must, therefore, be deemed the settled law of this State, that all actions must be brought in the county where the defendant resides, except such as the statute expressly provides shall be brought elsewhere.

It is assumed that this is not strictly a civil action, but is

a special proceeding, and is not governed by section 312, R. S. 1881. But it has been expressly ruled that such a proceeding as this is a civil action. In *Reynolds* v. *State, ex rel.*, 61 Ind. 392, the question came directly before the court, and in deciding it the court said : " It is clear, we think, from this section of the code, that an information in the nature of a *quo warranto*, in this State, is a civil action."

If, however, it were conceded that the position of the appellee is tenable, still, it would by no means result that section 312 does not apply, for it is now quite well settled that the provisions of the code do apply to all proceedings, whether under special statutes or not, unless excluded by the provisions of those statutes. *Evans* v. *Evans*, 105 Ind. 204; *Bass* v. *Elliott*, 105 Ind. 517, and cases cited; *Burkett* v. *Holman*, 104 Ind. 6 ; *Burkett* v. *Bowen*, 104 Ind. 184; *Powell* v. *Powell*, 104 Ind. 18.

Statutes are to be regarded as forming parts of one great and uniform body of law, and are not to be deemed isolated and detached systems complete in themselves. *Humphries* v. *Davis*, 100 Ind. 274 (50 Am. R. 788); *Lutz* v. *City of Crawfordsville, post*, p. 466.

It would be a departure from principle to declare that each " special proceeding " is complete in itself, and it would be a departure productive of serious evils, for scarcely one of all the " special proceedings " can be carried into practical effect without aid from the code of civil procedure. It is necessary in almost, if not quite, every instance, to refer to the provisions of the code in order to give any effect to these special proceedings, and certainly this must have been intended by the Legislature, for had it undertaken to make each system complete in itself, many ponderous volumes of statutes would have been required.

It is the judgment of this court that the circuit court had no jurisdiction to grant the order of injunction, and that, upon the facts set forth in the appellant's plea, that court had no jurisdiction of the person of the appellant.

Robertson *v.* The State, *ex rel.* Smith.

The cause is remanded, with instructions to dissolve the restraining order, and for further proceedings in accordance with this opinion. ·

Filed Feb. 23, 1887.

DISSENTING OPINIONS OF MITCHELL AND HOWK, JJ.

MITCHELL, J.—While concurring in the opinion of the court, to the extent that it holds that an information to try the title to an office can only be tried,—unless by consent,—in the county in which the defendant resides, I do not concur in the view that there was such a want of jurisdiction in the court below, over the person of the defendant, as excuses this court from giving a statement in writing of each question arising in the record, and the decision of the court thereon. Section 5, Art. 7, Const. The record discloses that the appellant was personally served with summons in Marion county, that he appeared in person and by counsel, and pleaded in abatement of the jurisdiction of the court. It, therefore, became at most a mixed question of law and fact, to be determined by the learned judge, whether or not jurisdiction of the defendant's person had been acquired, either by the process of the court, or by the consent of the defendant. The court may have decided erroneously, but if it did, this was an error in no sense different from any other which occurs in the progress of a cause. As is said by a standard author: "There is a difference between a want of jurisdiction and a defect in obtaining jurisdiction. At common law the defendant was brought within the power of the court by service of the *brevia,* or original writ. In this country the same object is accomplished by service of summons, * * * or by the voluntary appearance of the defendant in person, or by his attorney. From the moment of the service of process, the court has such control over the litigants that all its subsequent proceedings, however erroneous, are not void. If there is any irregularity in the process, or in the manner of its service, the defendant must take advantage

of such irregularity by some motion or proceeding in the court wherein the action is pending." Freeman Judgments, section 126.

It can not, therefore, with propriety be said, that the court below had no jurisdiction over the person of the defendant. It decided upon inspection of its own process, that it had jurisdiction, and while it may be true, that upon the facts as they appear, or may be hereafter shown, its jurisdiction may have been defectively obtained, and that the restraining order may well be for that reason dissolved, it does not follow that this court, because it finds one error, is thereby excused from giving its decision upon the real questions which the record presents.

Certainly no court has ever set up the unwarranted pretence that it could with propriety either give a decision, or intimate an opinion, in a case which involved a subject-matter over which it had no jurisdiction, or where it had no jurisdiction of the parties.

The record before us does not present such a case. If the court below had decided, as it very properly did, in the recent case of Smith v. Myers, ante, p. 1, that it had no jurisdiction of the subject-matter, the duty of this court would have terminated with the examination of that question. So, also, if after having acquired, through its process, jurisdiction of the appellant's person, it had decided that its jurisdiction was so imperfect as not to warrant it in proceeding further, the examination of that question would have ended our duty on this appeal. The court below, however, decided that it had jurisdiction of the person of the defendant, and proceeded to adjudge other questions which appear in the record. Precedents will be looked for in vain to support the proposition that an erroneous decision of a nisi prius court, on the subject of the completeness of its jurisdiction over the person of a litigant, renders it improper for an appellate court, after the nisi prius court has held its jurisdiction complete, to examine

other questions subsequently decided by such court, and properly presented by the record.

The reasons why such questions should be passed upon is, that it is within the power of the parties, at any moment, to perfect the defective jurisdiction of the court below over their persons by consent. We can not say in advance, that they may not do so, especially if the decision of the court should be favorable to the party defectively served.

" This is in accordance with the general line of judicial precedent, and is sanctioned by an example furnished by so illustrious a tribunal as that of the Supreme Court of the United States, under the presidency of Chief Justice MARSHALL, he himself delivering the opinion in the given case. *Marbury* v. *Madison,* 1 Cranch, 137. We can not greatly err in following the precedent set by so learned and pure a court." *State, ex rel.,* v. *Allen,* 21 Ind. 516.

The questions of chief concern to the parties, and which, by reason of the relation of the parties to the State, are of vital importance to the public, relate to the jurisdiction of the court over the subject-matter of the information. This subject also involves the validity of the election held in November, 1886, for Lieutenant-Governor.

These subjects concern the second office in one of the departments of State. Between the office in contest, and that of Chief Executive of the State, is interposed only the slender thread upon which hangs a single life. Should the Governor become disabled, the confusion which vexes the public service now would be transferred to, and turn into chaos, the office of the Chief Executive, to be settled by such means as the contestants and their respective adherents might be able and willing to employ.

The question always properly first in order in every court is, whether it has jurisdiction over the subject-matter of the suit. This and cognate questions were elaborately argued by learned and eminent counsel on both sides. The exigencies of the public service demand that they should be settled.

Robertson *v.* The State, *ex rel.* Smith.

The relator's case proceeds upon the theory that an election for Lieutenant-Governor can only occur once in four years. His claim is, that in April, 1885, the Senate, of which body he was then and still is a member, elected him as its president *pro tempore.* By virtue of this election, he asserts that he became vested with a right to discharge the duties of the office of President of the Senate, on any occasion when the Lieutenant-Governor should thereafter be absent, until the Senate, in its pleasure, should remove him. He alleges that the Senate, when it assembled in January, 1887, recognized his right, and re-elected him to the office. Thus he claims to have been incumbent in the office of President of the Senate by a title founded in the Constitution, at the time and before the election in 1886 occurred, and that he is now in the discharge of its duties under the authority of the Constitution.

Thus he asserts that the Constitution has prescribed a method for supplying any vacancy which may occur in the office in question during the period intervening quadrennial elections, and that by his election by the Senate, the office was supplied before the election in 1886 occurred. Hence, the argument is, there was no vacancy which authorized or required an election by the electors of the State, or which gave color of support to any of the subsequent steps in that connection, resulting finally in the declaration by the Speaker of the House that the respondent had been elected to the office of Lieutenant-Governor.

The position of the respondent is, in effect, that if both the law and the fact be as claimed by the relator, yet the court can not so decide: *First.* Because the controversy involves a contest over the election of, and is, therefore, said to be a contested election for, Lieutenant-Governor. All such contests, it is argued, are by the Constitution expressly committed to the final determination of the General Assembly. *Second.* Because, even though this should not be considered a case of contested election, since the subject of the informa-

tion involves the right to exercise an office which pertains to a co-ordinate branch of the State government, the contention is, that it is a matter exclusively of political, and not of judicial concern. Hence it is said the subject-matter is foreign to the jurisdiction of, and is not cognizable by, the courts.

The first question for consideration, therefore, is, do the facts presented in the information make this a case of contested election, within the purview of section 6, article 5, of the Constitution, which reads as follows: " Contested elections for Governor or Lieutenant-Governor shall be determined by the General Assembly, in such manner as may be prescribed by law?"

Pursuant to this provision the General Assembly has enacted, in substance, that the election of any person declared elected by popular vote to any State office, may be contested by any elector entitled to vote for such person. Provision is made for the organization of a committee, to be selected from the members of both houses, before which the contest is to be carried on. The causes of contest are prescribed, and the mode of procedure marked out. The judgment of this committee is to be reported to each house separately, and is to be conclusive.

The causes for which an election may be contested are, (1) irregularity or malconduct; (2) ineligibility of the contestee; (3) infamous crime in the contestee; (4) illegal votes. Section 4756, R. S. 1881.

An examination of the Constitution and the legislation which has followed makes it manifest that all contested elections for Governor or Lieutenant-Governor are committed to the exclusive judgment of the General Assembly, to be determined by the committee for which provision is made, under the rules and regulations prescribed in the statute.

From the authorities and upon principle, these general conclusions may be deduced: 1. When the Constitution confers the power, and enjoins the duty, of determining con-

tested elections upon the General Assembly, its power in that respect is plenary, final and exclusive, in the specific cases mentioned. 2. When the Constitution confides to a legislative body the power to judge of the election and qualification of its own members, the exercise of that power belongs exclusively to the body to which it is so committed, and is not the subject of review in the courts or by any other body. *State, ex rel.,* v. *Baxter,* 28 Ark. 129; *State, ex rel.,* v. *Marlow,* 15 Ohio St. 114; *State, ex rel.,* v. *Tomlinson,* 20 Kan. 692; *People* v. *Mahaney,* 13 Mich. 481; *People* v. *Fitzgerald,* 41 Mich. 2; *Alter* v. *Simpson,* 46 Mich. 138; *State* v. *Gilmore,* 20 Kan. 551 (27 Am. R. 189); *O'Ferrall* v. *Colby,* 2 Minn. 180; Cooley Const. Lim. 133; McCrary Elec., section 515; *Hulseman* v. *Rems,* 41 Pa. St. 396.

While it is undoubtedly true that every contested election involves the title to an office, it can not with propriety be said that every contest or litigation which involves the title to an office, is a contested election. If the relator had, as he assumes, a vested legal right in the office of President of the Senate, which had its inception, and attached to him prior to, and which is in no wise dependent upon, or connected with the election through which the respondent claims, it is not apparent how such right can become involved in a contested election. If, under the Constitution and law, the relator had a right anterior to the election, and if, as he further assumes, the election was unauthorized, then the mere holding of such election could not involve the pre-existing title in an election contest. The vested right could not have been annihilated by an unauthorized election, nor can the question of the existence of such a right, anterior to and independent of the election, be taken out of the cognizance of the judicial tribunals, by the mere fact of an election. *Magruder* v. *Swann,* 25 Md. 173.

The logic of the adverse contention is, conceding all that the relator claims in respect to his antecedent right, as well as the invalidity of the election, that the title of the relator,

has nevertheless become so involved in and confused by the form of an election, that there is now no power to ascertain and declare the title, except by resolving the controversy into a case of contested election, and by sending it to the General Assembly. By this method of reasoning, the jurisdiction of the court over the subject-matter is sought to be defeated.

This view of the situation is not, in my opinion, maintainable either in reason or upon authority.

The right in dispute is cognizable only by judicial authority. All the judicial power of the State, except such as is specifically conferred upon other departments of the government, is committed to the courts. The authorities support the proposition that where one department of the government is, in special cases, authorized to exercise power which belongs in general to another department, the exercise of such power will be limited strictly to the subjects specially enumerated. To declare what the law is, is a judicial function. *Kilbourn* v. *Thompson*, 103 U. S. 168; *Marbury* v. *Madison, supra; People* v. *Keeler*, 99 N. Y. 463 (52 Am. R. 49).

The judicial power committed to the General Assembly is, in respect to the subject now under consideration, only such as strictly pertains to cases of contested elections for Governor and Lieutenant-Governor. The causes for such contest are specifically enumerated in the statute. These causes are only such as arise out of, and pertain to, an election.

Before there can be a contested election, an election must have been held. An election implies the choice of a qualified person to an office, by an electoral body, at the time, and *substantially* in the manner and with the safeguards provided by law. The electoral body may manifest its choice in a manner which leaves no doubt of the fact of choice, yet, if such choice be manifested at a time, or under conditions, unknown to the law, the fact of choice, however unmistakable, goes for nothing. Under a government such as ours, the people derive their power to elect officers from the written law, which they themselves have prescribed. It is

Robertson *v.* The State, *ex rel.* Smith.

not inherent, to be exercised upon any and every occasion when they may assemble together. The force and efficacy of the ballot are derived from the Constitution and laws, and no one can predicate title to an office upon a popular vote, unless such vote was cast at a time when the Constitution and laws authorized an election for that office to be holden. *People* v. *Weller,* 11 Cal. 49; *Foster* v. *Scarff,* 15 Ohio St. 532; *Sawyer* v. *Haydon,* 1 Nev. 75; *Biddle* v. *Willard,* 10 Ind. 62; *Commonwealth* v. *Meeser,* 44 Pa. St. 341; *State* v. *Stauffer,* 11 Neb. 173; *State* v. *Whittemore,* 11 Neb. 175; *State* v. *Buck,* 13 Neb. 273; *State* v. *Hedlund,* 16 Neb. 566; McCrary Elec., section 109; Cooley Const. Lim. (5th ed.) p. 747.

If, by the Constitution, the electors had surrendered to others, chosen by themselves, the power to supply the office, the title to which is in dispute, by electing another to perform the duties of the office, they may not, without changing the fundamental law, resume such power at their pleasure. The adverse argument is, in effect, that because there has been an election in form, the court may not inquire whether there has been an election in law. Because a title to an office is asserted as the result of an election, the pre-existing title of an incumbent in the same office becomes merged in the form of such election, and is hence no longer a subject of judicial inquiry in the courts.

Having assumed the point in dispute, viz., that there has been an election, the definition of the word "contest" is made the basis for the conclusion that this is a case of contested election.

But, it is said, even if this be not a case of contested election, the subject of the right or office in dispute is cognizable solely by the political department of the State government. Hence, it is said the court below has, and had, no jurisdiction to entertain the subject of the information. Whatever the determination of the General Assembly may be, even though, as in the case now under consideration, one branch of the

Assembly determines in favor of one claimant, and the other branch in favor of the other, it is said the judgment of the General Assembly is conclusive on the courts, and the people, in a case like this. The argument is, that an exposition by the courts of the law of the case would be to subordinate the supreme will of the Legislature,—would be an encroachment upon its prerogative.

The argument addressed to this feature of the case derives its force mainly from the alleged impotency of the court. Whatever its judgment may eventually be, it is said, it possesses no power to enforce its mandate, and hence its jurisdiction would be futile. The assumption is, that under our system of government, official station may be of such quality and degree that all inquiry into the title or pretence of one who asserts a right or claim to such station, is denied the judicial department.

In respect to this assumption, an author, distinguished for his learning, has said : " There is a basis of truth in this argument : the executive of the State can not be subordinated to the judiciary, and may, in general, refuse obedience to writs by which this may be attempted. But when the question is, who is the executive of the State, the judges have functions to perform, which are at least as important as those of any other citizens, and the fact that they are judges can never be a reason why they should submit to a usurpation. A successful usurpation of the executive office can only be accomplished with the acquiescence of the other departments; and the judges, for the determination of their own course, must, in some form, inquire into or take notice of the facts." Cooley Const. Lim. 786. High Extraordinary Legal Remedies, section 634 ; *Kerr* v. *Trego*, 47 Pa. St. 292.

It has been contended, in effect, that this is an application to the court to determine who shall preside over the Senate, and that because that body is a branch of an independent department of the State government, it has the inherent and exclusive right to determine that question for itself. That

if it determines that the relator has the right, it is possessed of ample power, without the aid of the court, to protect him in its enjoyment, and if it is the pleasure of the Senate that the respondent should preside, it is not in the power of the court to subordinate its will. The argument is specious, but it rests on a misapprehension of the case as it appears upon the record. The court is not asked to confer a right upon, or create a title in, the relator; nor is it asked to determine who shall preside over the Senate. The case proceeds upon the theory that the Senate, in the exercise of its constitutional prerogative, has conferred the right upon the relator, and that the respondent is unlawfully interfering with the right so conferred, and still recognized as existing, by the body which conferred, and had the power to confer, the right. The judgment of the court in this, as in all other controversies concerning the rights of parties, can not create the right in one, or destroy it in the other. The rights of each are fixed by the Constitution, and the jurisdiction of the court is invoked, as the mere instrument of the Constitution, to ascertain and declare their rights as they are.

The office of the court in all controversies is, not to create rights, but to ascertain and enforce them when ascertained. In this respect the case is not different from any other controversy between parties, involving rights of property. Nor is the jurisdiction of the court to be determined by the situation of the parties, or their ability to enforce their respective rights, without the aid of the court. Because a controversy has arisen between two individuals, involving the right or franchise to preside over the Senate, in no legal sense involves the Senate, as a legislative body, further than such controversy may affect the dignity and decorum which should attend its sessions. The Senate has no more power to adjudicate, except provisionally, upon an existing legal right or title of its presiding officer, than it has upon the legal rights of any other individual. Grant that the Senate has the

power, as it doubtless has, to refuse to permit its chamber to be made the arena in which to settle the disputed right or title, by such means as may seem available to the parties, does it follow that either party is forever precluded from invoking the judgment of the law upon the right in dispute? The General Assembly can not, nor can either branch of it, act judicially upon the right in dispute. Suppose it be true, as is claimed on the one hand, that the relator is presiding over the Senate without authority of law and in open defiance of the lawfully expressed will of the people, will it be said that because he does so with the concurrence of the Senate, and under the protection of its officers, the respondent's right is destroyed, unless he establish it by force? Must the right be forever abandoned without judicial examination? Or suppose it be true, as is asserted on the other hand, that the respondent, in defiance of law, being supported by the House, intrudes into, and interferes with the constitutional rights of the relator, are the parties without other means of settling their rights under the law, except it be to set their respective supporters in array?

The right must remain in perpetual dispute until some tribunal, which has authority to pronounce judgment on the case, declares in favor of one party or the other. The law is without force or efficiency until vitality is breathed into it through the judgment and process of the court. Until the court speaks the judgment of the law, the contest must proceed by methods extra-judicial, unless one party or the other abandon his claim. Shall the court, the exponent of the law, though formally invoked, refuse to speak, while the unseemly contest goes on? Or must it first inquire whether the party against whom it may declare, will obey the voice of the law before it makes response?

It can not be admitted or shown that the parties are reduced to this extremity. The same Constitution which conferred the right, wherever it may be lodged, has provided the remedy for its protection. That instrument requires that

"All courts shall be open; and every man, for injury done to him in his person, property, or reputation shall have remedy by due course of law." Authority to adjudge the disputed claim having been lodged in no other tribunal, the courts must declare the law, and then it becomes the duty of the Chief Executive, under the sanction of his oath, to "take care that the laws be faithfully executed."

Whenever it becomes a question whether or not there was a vacancy to be filled by an election or appointment, or where the question is, did the law authorize the election or appointment in a given case, it is universally held that the courts have jurisdiction to determine the law of the case. There is no authority which holds to the contrary. *Commonwealth* v. *Meeser*, 44 Pa. St. 341; *Prouty* v. *Stover*, 11 Kan. 235; *State* v. *Francis*, 26 Kan. 724; *Page* v. *Hardin*, 8 B. Mon. 648.

A decision by the Legislature, that a constitutional office is vacant, can not destroy the pre-existing title of an incumbent.

The question presented by the record, and questions closely analogous, have been the subjects of adjudication in the courts of last resort in some of the States, as well as in the Supreme Court of the United States. Uniformly, the jurisdiction of the courts to determine the title to an office is maintained, unless the right to determine such title has been expressly confided to some other tribunal. The person claiming such a vested right may invoke the aid of the court, to ascertain and protect his right, against any one who unlawfully assails it. Thus, in the case of *Marbury* v. *Madison, supra,* which involved the right of the court to coerce the delivery of a commission by the head of one of the departments of the Federal government, through which it was claimed an individual had secured a vested right in an office, Chief Justice MARSHALL said: "If one of the heads of departments commits any illegal act, under color of his office, by which an individual sustains an injury, it can not be pretended, that his office alone exempts him from being sued in the ordinary

mode of proceeding, and being compelled to obey the judgment of the law. * * * It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing the mandamus is to be determined."

The proceeding here is not against the respondent as an officer, but because, it is alleged, he unlawfully assumes to act as such, to the injury of another, who claims the right. Being sued as an individual who is wrongfully attempting to exercise the functions of an office, he may not cover himself with the mantle of the office in dispute, and in that character claim that he is so related to a co-ordinate branch of the government that all judicial inquiry must be suspended. *Attorney General* v. *Barstow*, 4 Wis. 567; *Cunningham* v. *Macon, etc., R. R. Co.*, 109 U. S. 446; *United States* v. *Schurz*, 102 U. S. 378; *United States* v. *Boutwell*, 17 Wall. 604; *Kendall* v. *Stokes*, 3 How. 87; *Bates* v. *Clark*, 95 U. S. 204; *United States* v. *Lee*, 106 U. S. 196; *Poindexter* v. *Greenhow*, 114 U. S. 270; High Extraordinary Legal Remedies, sections 634, 635, and notes.

Whether the court below properly entertained jurisdiction of the subject-matter of the information, can only be determined by inquiring whether the election held in November, 1886, for Lieutenant-Governor, was or was not a valid election. If the election was authorized by the Constitution and laws, then the votes of the electors communicated a title to the office of Lieutenant-Governor, to the respondent, which can neither be impeached nor inquired into save by the General Assembly.

If the election was not authorized by law, then in legal contemplation there has been no election, and the pre-existing title of the relator can not be involved in a case of contested election. His title, in that event, is the subject of adjudication in the courts. *Matthews* v. *Board, etc.*, 34 Kan. 606.

Article 5 of the Constitution, entitled "Executive," creates two offices, or public stations, and makes provision for

the election of three officers.   The offices created embrace the duties of the Chief Executive of the State, and those of the President of the Senate.   The officers for whose election and service provision is made, are entitled respectively, Governor, Lieutenant-Governor and President of the Senate. These stand related to each other so as to supply an order of succession.   The first two are elected by the people, and are each to hold their office during four years.   The third is to be elected by the Senate, whenever the occasion may require. While the officer entitled Governor fills the Chief Executive office, the one entitled Lieutenant-Governor is, so long as he is able to attend, *virtute officii*, President of the Senate. While the Lieutenant-Governor presides over the Senate, he who may become President is a senator.   In the absence of the one next above, the one next below succeeds to his duties.   In respect to the first two, the plain implication is, that when one is chosen the other must be.   This inference arises from the manner in which the elector is required to designate for whom he votes, and from the manner of the return, canvass and publication of the vote.   The official term of both is fixed alike, the beginning and ending thereof being fixed for all time.   The duties which pertain to the office of Chief Executive are prescribed, and provision is made, that in case of the removal from office of the Governor, or of his death, resignation, or inability to discharge the duties of the office, the same shall devolve on the Lieutenant-Governor.   Section 10 also enjoins upon the General Assembly to provide by law for the case of removal from office, death, resignation, or inability, both of the Governor and Lieutenant-Governor, and to declare what officer shall then act as Governor.   The officer so to be declared is then to act accordingly, until the disability be removed, or a Governor be elected.   It is provided that the Lieutenant-Governor shall, by virtue of his office, be President of the Senate, with the right to join in debate, and vote when the Senate is in committee of the whole, and to give the casting vote when

the Senate is equally divided. Such other duties as are annexed to the office of President of the Senate arise by parliamentary law. The duties thus assigned to the Lieutenant-Governor are precisely those which parliamentary law assigns to the presiding officer or speaker of a legislative assembly. Cushing Par. Law, sections 306–310. Section 11 provides that whenever the Lieutenant-Governor shall act as Governor, or shall be unable to attend as President of the Senate, the Senate shall elect one of its own members as President for the occasion.

Thus it will be seen that the 5th article of the Constitution has created the executive office, divided it into official terms of four years each from a given day, and .provided that the tenure of those who may fill the office, or discharge its duties, shall be four years. It has also created the office of President of the Senate, and designated the manner in which it shall be supplied with an incumbent. It has made provision for the election of three constitutional officers, to the end that two constitutional offices may be constantly, and without interruption, supplied with incumbents. Two of the officers are to be elected concurrently, by the electoral body at large, every four years. The election of the third may or may not be held in abeyance, until the occasion for his election arises. When the occasion arises he is to be elected by the Senate. The inquiry then is, how may the occasion arise, which requires the election of the third officer for which the Constitution has made provision, and what are to be his official duties when he is called into being?

Provision having been made for three officers, while concurrent duties were prescribed for but two, the inference arises at once, that the framers of the Constitution deliberately contemplated that emergencies might arise, in which a supernumerary officer would be necessary, in order to secure the discharge of the duties pertaining to the executive department. It is at once apparent that an order of succession was accordingly arranged, so as to prevent the possibility of a

vacancy during any of the executive terms into which the future had been divided. Contemplating the possible removal from office, or the death, resignation, or other disability of the Governor, and to the end that the executive office might not thereby become vacant of a constitutional incumbent, it was provided that upon the happening of any such event, the duties of that office should at once devolve upon the Lieutenant-Governor. This provision made it impossible that the succession in the office of Governor should ever be broken during an executive term, or the office become vacant while there remained a Governor, or Lieutenant-Governor qualified to act.

Foreseeing, moreover, that in the event the Lieutenant-Governor should be required to assume the functions of Governor, he would be unable to perform the incompatible duty of acting as President of the Senate, and realizing that the Lieutenant-Governor might be unable to attend as such President by reason of death, resignation, or other cause, the framers of the Constitution ordained that it should be the duty of the Senate to elect a President *pro tempore,* for any such occasion. This was to the end that a qualified person might be at hand, or might at once be supplied, when the occasion demanded, who should be clothed with the power to discharge the duties which by the Constitution were assigned to the Lieutenant-Governor in virtue of his office.

Thus it will appear, by attending to the constitutional scheme, that there never can be a moment, during any quadrennial period, when the Constitution itself has not supplied an officer, qualified to discharge the duties assigned to the Governor, or Lieutenant-Governor, without calling for the intervention of the electoral body.

In the character of Lieutenant-Governor, that official is required, during the inability, whether temporary or continuous, of the Governor to discharge the functions of the executive office; while during any like inability of the Lieuten-

ant-Governor to act as President of the Senate, the duties of that station are devolved upon the President *pro tempore.*

Still further, the article of the Constitution which makes provision for the succession in the executive office, contemplates the possibility that both the Governor and Lieutenant-Governor may at the same time be disabled from discharging the functions of their respective stations.

So far attention has been given to the precautions taken in order that a vacancy might not occur, in the event of the death or disability of one or the other of these two officers. As it seems to fortify the conclusion that in no event was it contemplated that an election should intervene during the progress of an executive term, it may be well to consider briefly the other contingency provided for. What was deemed necessary in the event of the death, resignation or inability of both Governor and Lieutenant-Governor? Was it contemplated that a vacancy would or might then occur in both offices? Clearly not. This is apparent from the fact that the General Assembly was enjoined to declare what officer should, in such an emergency, act as Governor. And why not, in the event of the death or resignation of both, also declare who should then be Lieutenant-Governor? Plainly because the only duties annexed to that office pertained to the Senate, and, therefore, in the next succeeding section, to the Senate was committed the duty, in any and every contingency, of supplying a person to perform those duties. There was hence neither necessity for, nor propriety in, an injunction that the General Assembly should declare by law who should act as Lieutenant-Governor, in case of the death or resignation of that officer. The duty of supplying a person to perform the functions of that office was to be, and was, committed without limitation to the Senate, by requiring the election of a President *pro tempore,* as often as occasion might require.

In pursuance of the constitutional mandate, the General Assembly provided in section 5559, R. S. 1881, as follows: "In case, by the removal from office, death," etc., "of both

Governor and Lieutenant-Governor, a *vacancy occurs in the office of Governor*, the President of the Senate shall act as Governor until the vacancy be filled; and if there be no President of the Senate, the Secretary of State shall convene the Senate for the purpose of electing a President thereof."

It thus appears that the Constitution, and also the legislation which followed in obedience to its requirement, indicate that the only account which was to be taken of the death, resignation or other inability of the Lieutenant-Governor was, that if the Senate had not already done so, it should then elect a President *pro tempore.*

It follows from a proper construction of the Constitution, that there can be no vacancy in the office of Governor or Lieutenant-Governor, so long as either remains qualified to act. Upon the death or disqualification of both, the Constitution contemplates that a vacancy may occur in the executive office alone. To meet such a possible emergency, it required the General Assembly to declare by law what officer should then act as Governor. This has been done accordingly. The confusion in which the situation is involved grows out of an attempt to confound names with things, titles with offices. It seems to be supposed that the duties and office of Lieutenant-Governor and President of the Senate, which, in virtue of his office, the Lieutenant-Governor may or may not fill, depending on circumstances, can only be filled by supplying some one to act therein with the title of Lieutenant-Governor. This is the fundamental error which underlies the appellant's case. An office, without a legally authorized incumbent, is not filled by merely employing a given title, nor can an office become legally vacant while the Constitution supplies an incumbent who possesses all the other requisite qualifications, except the title. It is the substance and not the shadow, the legally elected and authorized incumbent and not the title, that fills the office. In case of the death or resignation of the Governor, the executive office becomes, for the time being, titularly vacant. It does not, however,

while there is a Lieutenant-Governor, become vacant in fact. In case the Lieutenant-Governor acts as Governor, or in case of his death or resignation, the office of President of the Senate is, in respect of the name, vacated by the Lieutenant-Governor, but it no more becomes vacant in fact than does the office of Governor in the case first supposed.

The framers of the Constitution were not so much concerned that there should always be two persons supplied with the title of "Governor" and "Lieutenant-Governor," respectively, as that there should always be at hand two persons, legally qualified to discharge the respective duties of Chief Executive and President of the Senate.  As was pertinently said in the case of *Chadwick* v. *Earhart,* 11 Oregon, 389, "It is not shown how an office can be vacant and yet there be a person, not the deputy, or *locum tenens,* of another, empowered by law to discharge the duties of the office and who does in fact discharge them.  It is not explained how, in such a case, the duties can be separated from the office, so that he who discharges them does not become an incumbent of the office.  *  *  It is the function of a public officer to discharge public duties.  Such duties constitute his office. Hence, given, a public office and one who, duly empowered, discharges its duties, and we have an incumbent in that office."

In New York a law was passed establishing the office of superintendent of insurance.  The superintendent was to be appointed by the Governor for the term of three years, with authority to designate his deputy.  The deputy was to possess the powers and perform the duties attached by law to the office, during the absence and inability of the principal.  The superintendent resigned his office.  The Court of Appeals, speaking of the status of the former deputy after the resignation of the superintendent, said: "It thus appears that the statute confers, in the case of a vacancy, upon the deputy all the powers, and imposes upon him all the duties, of the office of superintendent during its continuance.  In short, it makes

him to all intents and purposes acting superintendent for that time during which there is and can be no other superintendent. The act contemplates that there shall at all times be a person clothed with all the powers and subject to all the duties of the office of superintendent." *People, ex rel.*, v. *Hopkins*, 55 N. Y. 74.

So it may be said here, the executive department of the State is fashioned upon such a scheme, as that each executive term consists of four years, each term having a definite beginning and ending. The electoral body designates at quadrennial elections two persons, one of whom acquires an absolute right to be Chief Executive for four years. The other becomes a contingent, to act in case of the inability of the first named. Meanwhile the Constitution assigns certain duties to the contingent, connected with the Senate. The Senate is authorized and required to supply a contingent for the Lieutenant-Governor, to discharge the duties assigned him in case of his inability to attend as President of the Senate, and thus the Constitution contemplates that there shall be a contingent to the Governor and one to the Lieutenant-Governor, each clothed with all the power, and subject to all the duties of the principal officer.

The argument in support of the validity of the election has its foundation on section 18 of article 5 of the Constitution. This section provides, among other things, that when at any time a vacancy *shall have occurred* in any State office, the Governor shall fill such vacancy by appointment, which shall expire when a successor shall have been elected and qualified. Learned counsel in support of their position say: "We maintain * * that the constitution does contemplate vacancies in the office of Lieutenant-Governor. We say it is a 'State office' within the meaning of section 18, and that when a vacancy occurs, it being a State office, it is entirely competent—nay, it is the duty of the Governor—to appoint a Lieutenant-Governor to serve until a successor can be elected."

In my opinion this position is wholly untenable. There

is nothing in the Constitution which so much as raises an inference that the office of Lieutenant-Governor can become vacant, in a legal or actual sense. Nor is the Constitution fairly capable of such a construction as would authorize the strange anomaly of a Chief Executive appointing to office one who might by his voluntary act succeed to the executive office the next day after the appointment was made.

The confusion arises out of the fact that the office, and the duties which pertain to it, are spoken of as entirely distinct, whereas they are inseparably connected.

It is only where there is an existing office, without an incumbent lawfully authorized to discharge its duties, that the office is, in the eye of the law, vacant. The very idea and definition of the word "office" implies the right to exercise a public function or employment. The inevitable, logical conclusion, therefore, is, that whenever there is an existing office, the duties of which the law devolves upon a person or officer named, upon the happening of any given event, the person or officer so designated becomes, upon the happening of the event named, the incumbent of the office. This is so not because the person becomes *eo nomine* the officer, but because, while lawfully in the discharge of its duties, he fills the office. There was, therefore, assuming the facts stated in the information to be true, two insuperable obstacles to the appointment by the Governor of a Lieutenant-Governor, when General Manson vacated the office. One was, the office was not vacant, because the relator had been elected, and was then President *pro tempore* of the Senate. The other was, that the Constitution made provision for supplying the office, if it was not already supplied, by an election by the Senate.

In *Clark* v. *Irwin*, 5 Nev. 111, 128, the court says: "Two things must then concur: There must be a vacancy, and no provision made by the Constitution, or no existent law for filling the same, before the Governor can exercise the appointing power."

Robertson *v.* The State, *ex rel.* Smith.

Neither of the foregoing conditions was present.  As was, in effect, said in the case last above cited, if there was a vacancy, then the very Constitution which created the office filled the same, and there was no such condition of things as authorized an appointment.  An executive system in which the Chief Executive could, in any event, appoint his own successor apparent, thereby vesting such appointee with power to become President of the Senate, has, in my opinion, found no precedent in our form of government, either State or National.

The argument is, that a vacancy in the office of Lieutenant-Governor having occurred, such vacancy was to be filled first by appointment by the Governor, and then by the electoral body in November, 1886, under the provision of section 4678, R. S. 1881.  This section provides that a general election shall be held in the month of November biennially, at which all existing vacancies in office shall be filled unless otherwise provided by law.  It is said there is nothing in the Constitution which forbade the people to fill the vacancy in the office of Lieutenant-Governor.

To this there are three sufficient answers:

1.  There was no vacancy.

2.  If there was, the Constitution provided a mode of filling it other than by the electoral body, viz., by the election of a President *pro tempore* of the Senate.

3.  The Constitution by the clearest implication forbids an election for Governor or Lieutenant-Governor, except for the term of four years, which term can in no case commence at any other than the times specified in that instrument.

It is argued that the election, if lawfully holden, could only confer title for the unexpired executive term.  This construction reduces the office of Lieutenant-Governor, the term of which is fixed in the Constitution at four years, to the level of offices created by legislative enactment, and subjects the office by judicial interpolation, rather than by construction, to the operation of section 5567, R. S. 1881, which provides

Robertson v. The State, ex rel. Smith.

that "Every person elected to fill any office in which a vacancy has occurred shall hold such office for the unexpired term thereof." It has, however, been repeatedly held by this court, that this statute has no application to an office created by, and the term of which is fixed in, the Constitution. *Governor* v. *Nelson*, 6 Ind. 496; *Baker* v. *Kirk*, 33 Ind. 517; *State, ex rel.*, v. *Long*, 91 Ind. 351.

It must, therefore, be regarded as the settled law of this State, that when a person is elected to an office created by, and the term of which is fixed in, the Constitution, such election confers an indefeasible title for the full constitutional term.

The emphatic language of the Constitution is: "There shall be a Lieutenant-Governor, who shall hold his office during four years." The construction contended for would in effect require the court to add: "Except in case of an election to fill a vacancy, when he shall hold only during the unexpired term of such office." To do this, is equally beyond the power of the court and the Legislature. *People* v. *Burbank*, 12 Cal. 378. If it is competent by construction thus to add to the Constitution, the enactment of section 5567 was wholly unnecessary, as the provisions of that section could as readily have been interpolated into the statute by construction as into the Constitution. That the Constitution makes no provision for elections to fill vacancies in the office of Governor or Lieutenant-Governor, or for the limitation of the terms of persons elected to fill vacancies in those offices, is conclusive that no such vacancies were contemplated.

Among other objections to the construction thus given the Constitution, and which has, again and again, been given it in the administration of the executive department of the government, it has been contended that there would result an irreconcilable conflict between sections 8 and 10 of article 5. The first provides that no person holding any office under the government of the United States, or of this State, shall fill the office of Governor or Lieutenant-Governor. The sec-

ond provides that in case of the death or disability of both Governor and Lieutenant-Governor, the General Assembly shall declare what officer shall then act as Governor until the disability be removed. It is said that to declare that another officer of the State shall act as Governor in such a contingency, is a violation of section 8. The framers of the Constitution can not be involved in such contradiction. The scheme of the Constitution does not contemplate that either the Lieutenant-Governor or the President of the Senate shall, in any event discharge the functions of two incompatible offices. When the Lieutenant-Governor acts as Governor, or fills the executive office, he does so in the character of Lieutenant-Governor, and ceases for the occasion to be President of the Senate. When the President *pro tempore* of the Senate acts as President, he does so in the character and office of Senator, and does not become in name Lieutenant-Governor. The office of President of the Senate is for the time being appendant to that of Senator. When, however, the contingency arises that the President of the Senate is to act as Governor, he does so in his natural, and not in his official, capacity as Senator. He ceases for the occasion to be Senator. This is according to the principle declared in *Chadwick* v. *Earhart, supra.* It is there said : " If an office be appendant, as the expression is in 1 Leon. 321, to another office, the determination of the first office will determine the second. * * * On the contrary, if the nomination or appointment to an office be by *descriptio personarum* of one who holds some office by the title of which he is described, and who on some contingency is to enter and fill another office, the answering the description at the time the contingency arises designates him as the person who is to enter and fill the office, and when, as thus designated, he enters into the office, he holds it in his natural, and not in his official capacity."

The application of this principle results in dissipating all of the supposed incongruities in the constitutional provisions, to which reference has been made.

The same reasoning by which it is sought to prove that the office of Lieutenant-Governor becomes vacant upon the death or resignation of that officer, would, if valid, prove that under like circumstances the office of Governor also becomes vacant. It would also prove that when the Lieutenant-Governor, by reason of the death or resignation of the Governor, acts as Chief Executive, the office of Lieutenant-Governor becomes vacant. Yet it is conceded that in such a case the latter office does not become vacant, and that the Lieutenant-Governor, while filling the office of Governor, does so as, or in the character of, Lieutenant-Governor.

Will it be pretended that while acting as Governor in such a case, the Lieutenant-Governor actually fills two offices, that of Chief Executive and President of the Senate? or does he fill the one in fact and the other in name, by his title?

In 1861, after the Governor-elect resigned, and the distinguished citizen who as Lieutenant-Governor supplied the executive chair, assumed the duties of the Executive, he as actually and effectually vacated the discharge of any official duty in any other office than that of Governor, as though he had died on the day he assumed the executive function.

It was absolutely certain that from thenceforth, during the remainder of the executive term, he would be disqualified, and unable to preside over the Senate. Did the office of Lieutenant-Governor thereby become vacant? Should there have been an election for Lieutenant-Governor holden in 1862, while Governor Morton was actually filling the executive chair in the character of Lieutenant-Governor, so as to have supplied the State with two Lieutenant-Governors, or was the office of Governor, while it was thus so adequately and actually filled, vacant, so that there should have been an election to supply that office? Perhaps it is well that the question which now perplexes the affairs of State, was then not so much as even suggested, to add confusion to the crisis which was then upon the people.

Consider the situation in which the affairs of the State are

Robertson v. The State, ex rel. Smith.

involved at this moment. The General Assembly, which it is asserted is the only body capable, and authorized to decide the pending controversy, consists of two wholly independent bodies. The Senate has decided for itself, that the right and title to the office in dispute was conferred by its election on the relator; while the House has given its judgment, that the election, the result of which was declared by its Speaker, conferred the title on the respondent. Each separate branch of the General Assembly has given its judgment on the case. The result of the judgment of the General Assembly is, to present to the people of the State two persons contending for one office, each supported by the judgment of one separate branch of the legislative department of the State. In this extremity the court is appealed to by one of the parties and asked to expound the Constitution and declare the law in respect to his claim of title to the office in dispute. Shall it now be said, that the best and only judgment which, under the Constitution, the law can give in the premises, is that which has been declared by the General Assembly? Is the extremity such that the confusion which now distracts the public service must continue until one or the other of the claimants tires of the contest, or abandons his claim, or may the court, in this as in any other case of disputed right, declare the law?

On behalf of the appellant, it was contended that the issuance of an injunction, in a case like this, was in excess of the jurisdiction of the court. After a careful consideration of the subject, I am constrained to concur in this view.

Without elaborating, my conclusion is, that all that a court can properly entertain in a case involving the title to an office, such as that in controversy, is some appropriate proceeding to determine the right in dispute. Its jurisdiction is limited to giving judgment on the naked legal right. So long as the title remains unsettled, it is not the province of the court to interfere by the extraordinary remedy of injunction

for the protection of one, or the restraint of the other, liti-- gant. This principle is peculiarly applicable to the case be- fore us, which involves a right to exercise an office which can. only be exercised under the supervision and protection of a co-ordinate branch of the government. While the legisla- tive department has no power to pass judicially upon the title- involved, each House when separately assembled, or the- joint assembly of both, has the power and the right to main- tain its own dignity, and the good order and decorum of its proceedings. For this purpose, when the right to preside is in dispute, each may, and must, determine provisionally, un- til the right .is judicially settled, who shall preside over its deliberations. Hence, while the courts are under the solemn duty, when their jurisdiction is properly invoked, of deter- mining the title, they may not, in a contest of such gravity, interpose their authority in a matter which concerns the propriety of the conduct and proceedings of the Senate, or joint assembly of the two Houses.

So far as the relator has invoked the jurisdiction of the court by an information, the proceeding is appropriate, to the end that the title to the office in dispute may be judicially determined. *Cochran* v. *McCleary,* 22 Iowa, 75.

The feature of the case which invokes the restraining power of the court can not, in my opinion, be entertained. *Beal* v. *Ray,* 17 Ind. 554; *Smith* v. *Myers, supra.*

For these reasons, while I think the court had jurisdiction. of the subject-matter, the restraining order should neverthe- less be dissolved, and the further order of the court should be that unless the respondent waives the question of juris- diction over his person, the pending case should be dis- missed.

Howk, J.—My judgment yields a ready and earnest assent to each and all of the conclusions of Mitchell, J., upon each and all of the momentous questions discussed by him, in this important cause. I can not say aught which would

give additional force to his able and exhaustive arguments
upon each of these questions. Therefore, I content myself
with earnestly concurring in his opinion.

Filed Feb. 23, 1887.

## INDIVIDUAL OPINION.

NIBLACK, J.—I concur with the conclusion reached in this
case, that, upon the facts disclosed by the record, the court
below had no jurisdiction over the person of the appellant,
and that, for that reason, if for no other, the judgment ap-
pealed from ought to be reversed.

I also agree that, having reached the conclusion that
there was no jurisdiction over the person of the appellant,
there is nothing we can say on the merits of the contro-
versy which can properly be considered as of binding
authority as a decision in the cause. But I trust that, under
the circumstances, it will not be deemed inappropriate for me
to express some individual views on some of the questions
discussed by my brother judges who have preceded me.

I am further of the opinion that the court below did not
have, and could not be made to have, any jurisdiction over
the subject-matter of the action.

Sections 4, 5 and 6, of article 5, of the present Constitution
of this State, as they are known by their original numbers,
are as follows :

"Section 4. In voting for Governor and Lieutenant-Gov-
ernor, the electors shall designate for whom they vote as
Governor and for whom as Lieutenant-Governor. The re-
turns of every election for Governor and Lieutenant-Gover-
nor shall be sealed up and transmitted to the seat of govern-
ment, directed to the Speaker of the House of Representatives,
who shall open and publish them in presence of both Houses
of the General Assembly.

"Section 5. The persons, respectively, having the highest
number of votes for Governor and Lieutenant-Governor shall
be elected ; but in case two or more persons shall have an

·equal, and the highest, number of votes for either office, the General Assembly shall, by a joint vote, forthwith proceed to elect one of the said persons Governor or Lieutenant-Governor, as the case may be.

"Section 6. Contested elections for Governor or Lieutenant-Governor shall be determined by the General Assembly, in such manner as may be prescribed by law."

These provisions of the Constitution, as I believe, confer upon the General Assembly of this State exclusive power and control over: *First.* Acting in part through the Speaker of the House of Representatives, who is charged with the duty of opening and publishing the returns, the matter of computing the votes cast at any election for Governor and Lieutenant-Governor respectively, and of determining and declaring the result arrived at by such computation. *Secondly.* The matter of electing both the Governor and Lieutenant-Governor when, by reason of a tie in the votes cast, there has been no choice by the people. *Thirdly.* All matters of contest arising out of the alleged election of any person either as Governor or Lieutenant-Governor, and, consequently, all questions affecting the rights of any person to hold the office of either Governor or Lieutenant-Governor.

The phrase "contested elections" has no technical or legally defined meaning. An election may be said to be contested whenever an objection is formally urged against it which, if found to be true in fact, would invalidate it. This must be true both as to objections founded upon some constitutional provision as well as upon any mere statutory enactment.

The primary meaning of the verb "to contest" as given by Webster is, "To make a subject of dispute, contention, or litigation; to call in question; to controvert; to oppose; to dispute." It is further defined as meaning, "To defend, as a suit or other judicial proceeding; to dispute or resist, as a claim, by course of law; to litigate." The power, therefore, to determine "contested elections" for Governor or Lieutenant-Governor necessarily carries with it jurisdiction

over every possible objection which may, under the Constitution or any statute, be urged against the so-called election of any person to either one of those offices. Section 4743, R. S. 1881, and the next three succeeding sections, prescribing the manner of proceeding in contesting the election of State officers, were evidently intended to carry into effect the provision of the Constitution concerning contested elections for Governor and Lieutenant-Governor, but the subsequent section 4756, which states generally the causes for which an election may be contested, does not specifically enumerate the objection presented in this case against the validity of the election of the appellant as Lieutenant-Governor, as a cause of contest, and it is for this reason claimed that the General Assembly has no jurisdiction to hear and determine such a contest as the complaint in this case was intended to present, and that hence, there being no other remedy, the courts must have jurisdiction to hear and determine such a contest. This does not by any means follow. As applicable to a tribunal having only statutory jurisdiction to hear and determine a contested election case, the claim might have much plausibility, but, as applicable to a tribunal upon which the Constitution has conferred complete jurisdiction, such a claim can have no foundation.

It must be borne in mind that the Constitution says that "Contested elections for Governor or Lieutenant-Governor *shall* be determined by the General Assembly." This is equivalent to saying that all such contested elections *must* be so determined. The failure, therefore, of the General Assembly to provide that a particular state of facts which, under the Constitution, ought to render an election for Governor or Lieutenant-Governor invalid, shall constitute a cause of contest, is simply a failure on its part to fully meet all the requirements of the Constitution, and, in the very nature of things, no authority is thereby conferred upon the courts to supply the omission.

As I construe the various sections of the Constitution hav-

Robertson *v.* The State, *ex rel.* Smith.

ing some bearing on the subject under discussion, in the light of the principles and usages governing American elections, the election of a Governor or Lieutenant-Governor may be contested for causes other than those specifically enumerated in the statute. If the person receiving the highest number of votes should prove to be an idiot or insane, and hence incapable of either comprehending the nature of the oath he would be required to take, or of discharging the duties of the office to which he has been elected, might not such a palpable disqualification be made a ground of contest? So, if the person receiving the greater number of votes, should, after the election, commit some high crime or misdemeanor, amounting to an impeachable offence under the Constitution, if committed after taking office, might not the General Assembly, upon a contest, declare him to be incapable of taking the office?

If there was no vacancy in the office at the time the election was held, or if the vacancy was one which the people were not authorized to fill at that time, could not either one of such facts be brought to the attention of the General Assembly by an elector, under the provisions of sections 4743 and 4744 of the statutes, above referred to, and the validity of the election be thus contested? If not, why not? But however that may be, I, for the reasons given, maintain that, whatever power the courts might otherwise have had to adjudicate controversies arising out of elections for Governor or Lieutenant-Governor, all jurisdiction over such questions has been conferred upon the General Assembly, to be exercised by it in such manner as has been, or may hereafter be, prescribed by law, and that, consequently, the courts of the State are wholly without jurisdiction to determine such controversies. The constitutional provisions, which I have above set out, take this case out of the rules of decision on kindred questions in some of the other States, and render many of the cases cited and relied on in argument totally inapplicable as precedents at the present hearing.

A careful examination of the Constitution and existing laws will disclose that all that pertains to the returns, and the contesting of the elections for Governor and Lieutenant-Governor, and to the counting in and inauguration of those officers, stands upon a footing different from that of other State officers. The Governor and Lieutenant-Governor receive no commissions as muniments of title to their offices. The only authentic record of any matter relating to their election is found in the journals of the two Houses of the General Assembly. All the State officers, who receive commissions, must have their oaths of office endorsed upon their respective commissions, and certified copies of such oaths must be filed in the office of the secretary of state.

Section 5519, R. S. 1881, prescribes the oath which every public officer of the State is required to take before entering upon the duties of his office. Section 5521 further enacts that "Members of the General Assembly shall take such oath before taking their seats, which shall be entered on the journals; and the Governor and Lieutenant-Governor shall each take such oath, in presence of both Houses of the General Assembly in convention, and the same shall be entered on the journals thereof." Thus it will be seen that every thing having relation to the returns and contests of their elections, to counting them in, and to the inauguration of Governor and Lieutenant-Governor, is wholly committed to the General Assembly, as much so and as exclusively, I respectfully submit, as each House is made the judge of the election, returns and qualifications of its own members. The Governor and Lieutenant-Governor may, for cause, be impeached by the House of Representatives, and tried and removed by the Senate, or may, in common with other State officers, be removed by a two-thirds vote of both Houses. The courts, for the causes stated, have absolutely nothing to do either with inducting the Governor and Lieutenant-Governor into office or with excluding them therefrom, in the first instance, or in getting them out of office after they may

have forfeited their right to remain in. Under the peculiar structure of our State Constitution, these are political and hence not judicial questions, and are committed to the General Assembly as the chief representative of the political power of the State.

But it is claimed that the case presented is that of two persons claiming the right to discharge the duties of the same office, and that in such a case the statute expressly authorizes a proceeding in the nature of *quo warranto* to settle such a controversy, independently of any provision of the Constitution concerning contested elections for Governor and Lieutenant-Governor. But the appellant bases his claim of right to preside over the Senate upon the assumption that he is the duly elected and qualified, and hence acting Lieutenant-Governor of the State.

The relator of the appellee bases his claim to be recognized as the presiding officer of the Senate, upon the assumption that there is at present a vacancy in the office of Lieutenant-Governor, and that, being a member of that body, he has, under the Constitution, been elected President *pro tempore* of the Senate, which confers upon him the exclusive right of presiding over its deliberations. Each, therefore, bases his claim to preside over the Senate upon a title essentially different from the other.

Conceding all the relator claims, he has not thereby become, in any proper sense, the Lieutenant-Governor of the State. He is still a Senator, and as such entitled to vote upon all questions coming before the Senate. He does not occupy, and, while remaining a Senator, can not be made to occupy, those supernumerary relations to the Senate which are, by the Constitution, imposed upon the Lieutenant-Governor.

There is nothing in the Constitution or laws of this State which prescribes the duties of a President *pro tempore* of the Senate, or confers upon him any fixed tenure of office. Under the parliamentary law, to which we must alone look in the absence of any constitutional or statutory provision on the

subject, the President *pro tempore* of the Senate is only its. presiding officer during the pleasure of that body. He may be removed at any time by a vote of the Senate, or the election of some other Senator to the same position. At all events, his term can not extend beyond the legislative term during which he is elected. Every fourth year, therefore,. his term of office must at the utmost expire about two months. before the end of the current term of Lieutenant-Governor. On this subject see section 3, article 4, of the Constitution ;. also section 9, article 5, of the same instrument. Consequently the relator and the appellant can not, with propriety, be considered as claimants to the same office. The points of collision between them are *sui generis,* and do not, as I conceive,. present a case either authorizing or requiring judicial intervention.

The condition of things complained of is really one of disorganization between the two Houses of the General Assembly, one recognizing the appellant as the lawfully elected and duly qualified Lieutenant-Governor of the State, and the other denying his title to that office.

This condition of disorganization develops a controversy over which the courts, on general principles, have no jurisdiction, and concerning which no court can exercise even the slightest control. It presents a case for legislative, and, consequently, not judicial arbitrament.

So far as I am able to perceive, the Senate has the unquestionable right to determine who is entitled to act as its presiding officer.

Section 16, article 4, of the Constitution, declares that "Each House shall have all powers necessary for a branch of the legislative department of a free and independent State." This provision is nothing more than an affirmation of the principles of the parliamentary law as applicable to the separate powers and relative independence of the two Houses of a legislative body like our General Assembly.

Each House is entitled to decide every question which falls

within its own exclusive jurisdiction. When, therefore, there is a contest as to which of two persons is entitled to preside over the Senate, the question, from the very necessity of the situation, becomes one which the Senate must decide. It may, as a matter of abstract law, decide incorrectly, but if it should, I know of no tribunal this side of the ballot-box which is authorized to review its decision. It has all the organization and official force necessary for the enforcement of its own rules and orders, and as much power in that respect as any other tribunal which does not command the military forces of the State. It may, under parliamentary law, punish persons guilty of a contempt of its authority. See Cushing Par. Law, paragraphs 655 and 671. This is, also, recognized as an existing power by sections 14 and 15, article 4, of the Constitution. In short, neither House either needs or is entitled to receive any aid or assistance from the courts in the performance of the various duties which the Constitution has devolved upon it. Then, too, I know of nothing in the Constitution, or in any statute, or prescribed by any rule of parliamentary law, which designates any officer as the person entitled to preside when the two Houses meet in joint convention. The right of a particular person or officer to thus preside might be established by a joint rule of the two Houses, but the complaint in this case makes no mention of such a joint rule. Assuming, therefore, that no such rule is in existence, I have no reason for believing that, when the two Houses assemble in joint convention, an aggregate majority of the body, thus composed, may not call whomsoever it pleases to the President's chair and authorize him to preside for the occasion.

It has most usually been the custom in this State for either the Lieutenant-Governor, or President *pro tempore* of the Senate, to preside on such occasions, but the custom thus most usually observed has not ripened into, or ever been accepted as, a precedent of binding authority. If, therefore, a joint convention may select whomsoever it pleases to preside over

its proceedings, it is too plain for argument that no court can inhibit the person thus selected from so presiding. I, consequently, know of no principle on which the restraining order granted in this case can be sustained, conceding that the court below had jurisdiction over the person of the appellant.

In response to much that has been said on the subject in argument, I feel quite assured that the Senate of this State is not, like the Senate of the United States, a continuous body. In the Senate of the United States, a majority constitutes a quorum, and as there is always more than a quorum of qualified Senators holding seats in that body, its organic existence is necessarily continuous. But in the Senate of this State two-thirds of its members are necessary to make a quorum. As one-half of its members go out of office at the end of each legislative term of two years, that is to say, on the day after each general and biennial election, it becomes at the end of each such legislative term, a disorganized body, and, as the officers of the Senate comprise an essential part of its organization, it necessarily results that the terms of such officers expire when the body becomes disorganized for want of a quorum. See section 3, article 4, of the Constitution, above referred to. This, of course, includes the President *pro tempore* when one has been elected. Cushing, *supra*, paragraphs 283 and 296.

I might still further enlarge upon some of the views I have thus expressed, but I deem it unnecessary for any practical purpose.

Filed Feb. 23, 1887.

## INDIVIDUAL OPINION.

ELLIOTT, C. J.—It will not, I trust, be thought improper for me to add something to what I have said in the foregoing opinion, for, in that opinion, I spoke for the court, expressing in part, but not in full, my own views. I fully concur in the opinion of my brother NIBLACK, that the courts have no jurisdiction of the subject-matter of this

action, and as the subject has been by him so fully and so ably discussed little can be added.

I began the investigation of this question with the impression that the courts had jurisdiction of the subject-matter, but I leave it with the firm conviction that they have not. This impression arose from a belief that it is better and safer that such controversies as this should be settled by some other tribunal than the Legislature, but, while still impressed with that belief, I am compelled to yield to the settled rules of the law and the clear words of the Constitution. Whatever may be the views of a court or judge upon a question of constitutional policy, the expressed will of the people, as written in their Constitution, must be obeyed and enforced. I am convinced that the framers of the Constitution have conferred upon the General Assembly exclusive authority over such controversies as this, although, regarded as a question of policy, I am persuaded that it would have been wiser to have entrusted the authority to some other tribunal. The makers of the Constitution had power to vest the authority in the Legislature, and they have done it. To their judgment all must yield.

The grant of power to the Legislature can not be defeated upon the presumption that it will not be justly exercised. On the contrary, it is the duty of the judiciary to assume that legislators will faithfully and impartially perform the duty imposed upon them by the Constitution they have solemnly sworn to support. Courts must accord to the Legislature the same solemn sense of duty, and the same conscientious resolution to perform it, unmoved by improper motives, that they can claim for themselves.

In *Brown* v. *Buzan*, 24 Ind. 194, it was said: "The judiciary ought to accord to the Legislature as much purity of purpose as it would claim for itself; as honest a desire to obey the Constitution, and, also, a high capacity to judge of its meaning."

It is, therefore, natural and reasonable to conclude that

the framers of the Constitution, influenced by this principle, believed that the Legislature would impartially hear and determine all controversies, and, acting upon that belief, inserted in that instrument the provision investing the General Assembly with power to determine all contests for the offices of Governor and Lieutenant-Governor.

There was a time in our history when eminent men, statesmen and jurists, believed that the courts had arrogated to themselves a power which did not belong to them, and that its assumption was hostile to the spirit of our institutions. So thought Jefferson, Madison, Jackson, Randolph, Van Buren and Bancroft in the earlier years of the Republic, and so thought Abraham Lincoln in the more recent years. Bancroft's History of Const., II., 198, 202; Garland's Life of Randolph, 327; Van Buren's Political History, chapter 8; Lincoln's first inaugural address. The illustrious lawyers and statesmen of the early years were leaders of men, and their utterances did much to mould and give tone to public opinion. Their most radical views prevailed with many in their own times, and are advocated by lawyers of our own day. Mr. Street's address before American Bar Association, 1883. The influence of those great men was widespread, and there is no doubt that their views controlled in a great measure the members of the constitutional conventions of the older States, and inspired them with the belief that the public good demanded that bounds be set to the power of the judiciary. Our own conventions, that of 1816 and that of 1851, borrowed from the older States, and, influenced by the same reasons as those which had moved the conventions of those States to limit the power of the judiciary in matters of a political nature, distributed the power by investing authority over controversies respecting the title to the executive offices in the General Assembly.

The members of the convention which framed the Federal Constitution believed that the courts should only decide purely judicial questions. One of the historians of the de-

bates of that body gives us substantially this account of the action of its members: Dr. Johnson, that historian says, moved an amendment to the provision relating to the jurisdiction of the courts, whereupon Mr. Madison said: He " doubted whether it was not going too far, to extend the jurisdiction of the court generally to cases arising under the Constitution, and whether it ought not to be limited to cases of a judiciary nature. The right of expounding the Constitution, in cases not of this nature, ought not to be given to that department. The motion of Dr. Johnson was agreed to, *nem. con.*, it being generally supposed, that the jurisdiction given was constructively limited to cases of a judiciary nature." 5 Elliott Debates, p. 483.

It is now firmly settled, and, as I believe, wisely settled in accordance with sound governmental policy and true principles of jurisprudence, that the judiciary has power to decide in all cases over which it has jurisdiction, upon the constitutionality of legislative and executive acts, but this just result was only reached after a fierce and stubborn conflict. Judges who asserted this principle were denounced in the bitterest terms in high places and in the public prints. Nor did the attack made upon them end in words. In 1796, during the troublous times in Rhode Island, so well described by Mr. McMaster in his history of the American people, the judges of the superior court were impeached for deciding an act of the Legislature to be unconstitutional, and, although they were acquitted, they lost their offices. In 1806, two of the judges of the Supreme Court of Ohio, Judges Tod and Pease, were impeached for making a similar decision, but, after a bitter contest, they were acquitted. These contests were the subject of much discussion, and the conduct of the judges was in many quarters wrathfully assailed, and in others stoutly defended. Denunciations of what was asserted to be a tyrannical usurpation of authority rang throughout the land, and many men, some of them great leaders, declared that the power of the judiciary must be confined within narrower

limits. The strife profoundly agitated the public mind, and its influence was felt in the halls of the conventions, and it led to a limitation upon the power of the courts.

It is always proper to examine the history of the country and study the discussions of the times in order to ascertain the meaning of constitutional provisions. It is, indeed, often necessary to do so, and from these sources light is oftentimes obtained that clears away obscurity and difficulty. Cooley Const. Lim. 81. In this instance history supplies material aid, for it informs us that there was a reason for limiting the power of the judiciary and a purpose to be accomplished in doing it.

A reason urged by some who denied the power asserted by the courts was, that a power so great should not be entrusted to men whose terms of office were for life, as in the earlier years of the Republic were the terms of the judges of the State and Federal courts. It was thought by many, whether justly or not it is not for the judiciary to decide, that it was wiser and better to place the authority of determining contests respecting the right to office in the hands of those officers whose terms of office were not of great duration. Ohio, Kentucky, and other States have taken the entire power from the courts and placed it in special tribunals. Our own court has recognized the general principle that it is often best to entrust high power to officers whose terms are short.

In *Brown* v. *Buzan, supra,* it was said : "Thus, to whatever extent this court might err, in denying the rightful authority of the law-making department, we would chain that authority, for a long period, at our feet. It is better and safer, therefore, that the judiciary, if err it must, should not err in that direction. If either department of the government may slightly overstep the limits of its constitutional powers, it should be that one whose official life shall soonest end. It has the least motive to usurp power not given, and the people can sooner relieve themselves of its mistakes."

This reasoning supplies grounds for sustaining the policy

of distributing the power of settling contests for office; for, if that power is lodged in the Legislature, the people can, at short and often-recurring intervals, rebuke where rebuke is needed, and approve where approval is merited.

Another reason given in support of the policy of placing contests for office under the jurisdiction of special tribunals is thus stated by the highest court of Kentucky: " The very purpose of providing these boards was to prevent the ordinary tribunals of justice from being harassed, and indeed overwhelmed with the investigations, and involved in the excitements to which these cases may be expected to give rise." *Newcum* v. *Kirtley*, 13 B. Mon. 515.

This argument is not without force. The wider the separation between judicial questions and political ones the better, for courts should be kept, if possible, entirely beyond the domain of political controversies. But, this is aside from our path, for it is not for the courts to judge of the strength or soundness of reasons which influenced the framers of the Constitution to enact the provisions there written; it is quite enough for them to know that there was a reason and a purpose in the minds of the men who wrought the Constitution of the commonwealth.

The power of determining who is, or who is not, rightfully entitled to the chief executive offices of the State, is, indeed, a very high one, and if the courts have that power, then, as they do undoubtedly have it over all other offices, except the legislative, they would have control over all offices save the legislative, and there was, therefore, at least some reason to doubt whether it was wise that they alone should wield a power of such great magnitude. It is, at all events, very evident that the makers of our Constitution deemed it wise to limit the power of the courts by investing the General Assembly with authority to decide all contests involving the title to the two principal executive offices of the State. There certainly are plausible, if not convincing, reasons for a distribution of the high power of determining titles to office,

since, as has been shown, if it is left wholly in the courts, they are invested with the highest power in the government, and one that some have not hesitated to affirm is autocratic. It is, indeed, claiming very much for the courts to assume that they possess the supreme power to decide all contests involving titles to office, and it is evident that the framers of the Constitution, regarding it as better to divide the power and limit the authority of the courts, placed all contests for the chief executive offices under the jurisdiction of the Legislature.

If it was not intended to take contests involving the title to the executive offices from the judiciary, there would have been no necessity for any specific provision upon the subject, and it can not be inferred that the framers of so solemn an instrument as the Constitution have done a vain and fruitless thing. But the provision is in the Constitution, and it is there for a reason. Because it was deemed wise to divide the power it was written : " Contested elections for Governor or Lieutenant-Governor shall be determined by the General Assembly." The meaning of the word *contested* is neither doubtful nor obscure, as my brother NIBLACK has shown, and as any one may see, by turning to the works of lexicographers. We are to interpret the Constitution by assigning to the words employed their usual meaning. Chief Justice MARSHALL said : " The enlightened patriots who framed our Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said." *Gibbons* v. *Ogden*, 9 Wheat. 1, 188. Judge COOLEY says : " What a court is to do is to declare the law as written." Cooley Const. Lim. 55.

The Constitution vests in the General Assembly sole and supreme jurisdiction over all disputes, controversies, or questions, whatsoever form or posture they may assume, arising out of a contest for the office of Governor or Lieutenant-

Governor.    The authority is to decide all phases of the con-
troversy, not some part or parcel of it.    This is the plain
import of the language employed, neither clouded by doubt
nor obscured by uncertainty.    It is a settled principle that
where jurisdiction of a subject is conferred upon any tribunal
it has jurisdiction of every part of it, and of every question
of law or of fact that can possibly arise from the beginning
to the end of the controversy.    Once jurisdiction attaches,
it exists for all purposes, all questions are within the au-
thority of the tribunal, and no other tribunal in the world
has a right to interfere with its decision except where there
is a right of review or appeal.    The rule rests on a solid
foundation, for, if one tribunal might decide one part of a
controversy and another some other part, there would be a
hopeless confusion that no power could clear away, and a dis-
astrous conflict that no tribunal could reconcile.

If it were conceded that the power to hear and determine
contests involving the title to the office of Lieutenant-Gov-
ernor is purely a judicial power, it would not impair the
force of the constitutional provision referred to, for it can
not be doubted that the people, in their sovereign capacity
and as the source of all power, may invest the Legislature
with pure judicial power.    They have, indeed, done so in
more instances than one.    It is a mistake to assume that the
Constitution confers power upon the people, for the people's
power is primary, original, inherent, and supreme.    Constitu-
tions limit, but they do not create, the power of the people.
The constitution is the creature, not the creator, of the peo-
ple's power.

In many instances powers of a judicial nature are con-
ferred upon the Legislature, and it has always been held that
where such a power is conferred, it is exclusive and supreme.
No other tribunal can share in its exercise, nor can any court
control it.    *People* v. *Mahaney*, 13 Mich. 481, 492 ; *State* v.
*Gilmore*, 20 Kan. 551 ; *State* v. *Tomlinson*, 20 Kan. 692 ; *Dal-*

*ton* v. *State*, 43 Ohio St. 652; *Smith* v. *Myers, ante*, p. 1, and cases cited.

A high tribunal has been established by the Constitution for the trial of contests involving the title to the offices of Governor and Lieutenant-Governor. That tribunal has all authority over the subject or it has none. It is not possible to assume that it may decide some questions, but not all, without contravening the long established rule that jurisdiction over the subject is jurisdiction over every question that can arise. The high tribunal provided by the Constitution is the special one to which all questions arising in a dispute, contest or controversy, involving the title to either of the executive offices, must be submitted. Where exclusive authority is vested in a special tribunal, courts have no jurisdiction to control, supervise or review its decisions.

In *Wright* v. *Fawcett*, 42 Texas, 203, it was said, in speaking of judicial power: "To decide the result of an election is a question of a different character, 'part of the process of political organization, and not a question of private right.' *Hulseman* v. *Rems*, 41 Pa. St. Rep. 396, and see *Arberry* v. *Beavers*, 6 Texas, 469; and *Baker* v. *Chisholm*, 3 Texas, 157; *Walker* v. *Tarrant Co.*, 20 Texas, 16. Where the law has provided a mode of deciding cases of contested elections, designed to be final, the courts have no authority to adjudicate such cases, other than that the law may give to them. *Batman* v. *Megowan*, 1 Met. Ky. 533; *Grier* v. *Shackleford*, 3 Brevard, 491; *Skerrett's Case*, 2 Parsons, 509, as reported in Brightly Lead. Cases on Elec. 320; *Ewing* v. *Filley*, 43 Pa. St..389." This principle is again asserted in *Rogers* v. *Johns*, 42 Texas, 339.

It was decided in the case of *State* v. *Harmon*, 31 Ohio St. 250, that "The authority conferred on the Senate to try contested elections is not judicial power within the meaning of * * the Constitution." In *State* v. *Marlow*, 15 Ohio St. 114, a similar principle was declared, the court saying: "Jurisdiction being thus specially conferred upon other tribunals,

and the mode of its exercise prescribed, it can not be inferred that it was intended by the Constitution to be differently exercised by a proceeding in *quo warranto,* as at common law, or by the Supreme Court and district courts, under a mere general grant of jurisdiction in *quo warranto.*"

The Constitution of Arkansas contains this provision: "Contested elections shall likewise be determined by both Houses of the General Assembly in such manner as is or may hereafter be prescribed by law." And the Supreme Court of that State held that a controversy between claimants to the office of Governor must be determined by the Legislature, the court saying: "Under this Constitution, the determination of the question as to whether a person exercising the office of Governor has been duly elected or not, is vested exclusively in the General Assembly of the State, and neither this nor any other State court has jurisdiction to try a suit in relation to such contest, be the mode or form what it may, whether at the suit of the Attorney General, or on the relation of a claimant through him, or by an individual alone claiming a right to the office. Such issue should be made before the General Assembly. It is their duty to decide, and no other tribunal can determine that question." *State, ex rel.,* v. *Baxter,* 28 Ark. 129.

No contest, controversy or dispute respecting the right to an office can ever be determined without deciding both questions of law and fact. Every controversy of a legal nature involves two elements, law and fact, and a tribunal having jurisdiction over the subject must, of necessity, have power to decide both the law and the fact. Without this power no progress could be made, and an adjudication would be impossible. The elements of law and fact which enter into all controversies are so blended and interwoven as to be absolutely inseparable. The law is the arbiter, and the facts invoke its powers. Without law there is no power to decide, for, without it, there would be no rule to determine the force and effect of the facts. On principle, it is plain that juris-

diction to hear and determine involves power to decide all questions of law and fact.    But authority is not wanting.

In *Batman* v. *Megowan, supra,* it was said, in speaking of a special tribunal, that "Its decisions are final on all questions of both law and fact, which may be involved in the investigation of the rights of the claimants to the office in contest."

Courts unhesitatingly decide all questions, whether of law or of fact, in election contests, and, surely, what the courts may do, the high constitutional tribunal, composed of the law-makers of the commonwealth, must do.

It is not necessary to go through the cases, for, beginning with *Waldo* v. *Wallace,* 12 Ind. 569, it has been the uniform practice to decide all questions of law, the grave as well as the trifling, which the contest involves.    This is the rule everywhere, in the legislative halls and in the courts.    One of the many examples where Congress decided a pure question of law was that of *Gholson and Claiborne,* decided in 1837, where the question was, as here, the right to hold an election.    Contested Election Cases, 9.    *Howard* v. *Cooper,* is another illustration, for, in that case, the question was as to the validity of an election.    *Ibid.* 275, 282.    In the case of *Grafflin,* of Virginia, the question was purely one of law, and was as to the right to hold an election at the time Mr. Grafflin claimed to have been elected.    *Ibid.* 464.

Precedents, however, are not needed, for it can not be conceived that power to determine a contest, dispute, or controversy, means nothing more than authority to determine the facts.

A high tribunal has been designated by the people to determine all contests for the office of Lieutenant-Governor; there the people have placed that great power, and there it must rest until the people in their sovereign capacity shall change their Constitution.

Filed Feb. 23, 1887.

### INDIVIDUAL OPINION.

ZOLLARS, J.—When the questions here involved are examined, it is not at all surprising that the honorable gentlemen, parties to this litigation, have honestly differed as to their rights, and the proper method of having those rights settled. Nor is it at all strange that their able and learned counsel have also differed, both as to the rights and the forum in which those rights are to be ascertained and settled.

The novelty and importance of the questions involved, and the want of entire harmony upon each proposition, have seemed to render it proper for different members of the court to submit their individual views upon some of the questions about which there is a difference of opinion.

At the bottom of the controversy, is the controlling question, as to whether or not the election for Lieutenant-Governor in November last was authorized by the Constitution and statutes of the State. Upon that question the relator, Smith, seeks a decision by the court.

That question, on the other hand, the respondent, Robertson, claims the court can not decide, because it has not jurisdiction so to do:

*First.* Because it has no jurisdiction over the subject-matter of the controversy; and,

*Second.* Because it has no jurisdiction over his person.

We are thus met, *in limine,* with the question of jurisdiction.

Jurisdiction is not a question of propriety, policy or choice, but one of power. Jurisdiction is the power to decide. When the question is made, the court must first examine and determine whether or not it has jurisdiction. When it is ascertained that it has not, both the power and the duty of the court are at an end.

When a question is before a court for decision, it is its duty, without hope of commendation or fear of censure, to decide it. And when a court has once determined that it has

not jurisdiction to decide and adjudicate, it should have the courage, without hope of commendation or the fear of censure, to say so, and to refrain from the expression of an opinion that will be a mere dictum, and from making an adjudication that will bind no one.

An opinion, or an adjudication, without jurisdiction, is a mere *brutum fulmen,* not only not binding on the parties to the suit, but which the humblest citizen of the State may disregard with impunity.

Such adjudications might well tend to destroy that confidence which, it is to be hoped, the people have in the conservatism and integrity of the courts.

The courts are the great conservators of organized society. If, by decisions extra-judicial, or by thoughtless, biased and unjust criticism, the people shall utterly lose confidence in them, then, indeed, shall we be at the beginning of the end, when anarchy shall take the place of order.

The question of jurisdiction, as made here, is two-fold. As I have said, it is insisted by the respondent, Robertson, that the Marion Circuit Court had not, and, hence, this court has not, jurisdiction over his person, he being a resident of Allen county. That he was and is a resident of Allen county, and not of Marion county, is admitted on all hands.

After a careful examination of the question, we all agree, that by reason of his not being a resident of Marion county, the Marion Circuit Court did not have jurisdiction over his person.

Upon that branch of the case I agree fully with what is said by ELLIOTT, C. J.

The respondent, Robertson, might have waived the point of the want of jurisdiction over his person. He did not do so. On the contrary, he insisted, and still insists, upon the objection. The courts can not compel such a waiver. We have no reason to assume, or presume, that he will, in any event, change his attitude in that regard.

The novel and difficult branch of the question of jurisdic-

tion, which is before us for decision, is, as to whether or not the court had, or has, jurisdiction over the subject-matter; in other words, whether the court had, or has, the power to decide in this case, and as between the parties here litigant, the legality and constitutionality of the election for Lieutenant-Governor in November last.  That question has challenged the greatest research, and the best thought of each one of us.

I agree with Judges NIBLACK and ELLIOTT, that in this case, the court has not jurisdiction of the subject-matter.  I do not, however, agree with all of the reasoning by which they reach that conclusion.

Upon that question, the arguments of counsel have taken a wide range, involving the structure of the State government, and the checks and balances, as established by the Constitution.  It is argued on the one hand, that an adjudication by the courts of the questions here involved, would be an unwarranted interference with, and an unwarranted infringement upon, the duties, functions and prerogatives of the legislative department of the government, by the judicial department.

As applied, simply, to the judicial and legislative departments of the government, as such, the argument, in my judgment, is not sound.

Article 3 of the Constitution, R. S. 1881, section 96, is as follows:  "The powers of the government are divided into three separate departments; the legislative, the executive, including the administrative, and the judicial; and no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this Constitution expressly provided."

By section 16, of article 4, of the Constitution, R. S. 1881, section 112, it is ordained, that each House of the General Assembly shall have all the powers necessary for a branch of the legislative department of a free and independent State. The primary object, and the proper function of the legislative department of the government, as such, is not to settle

controversies between citizens, nor to adjudicate upon their rights, whether those rights relate to private property or public office.

The primary object of the department, and its proper function, is to determine upon policy, and to carry that policy, by legislation, into laws. In distinguishing between judicial and legislative acts, the United States Supreme Court in the *Sinking-Fund Cases*, 99 U. S. 700, 761, said: "The one determines what the law is, and what the rights of parties. are, with reference to transactions already had; the other prescribes what the law shall be in future cases arising under it." So, in the case of *Wayman* v. *Southard*, 10 Wheat. 1, 46, Chief Justice MARSHALL said: "The difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes the law."

In speaking of the difference between a judicial and legislative act, the Supreme Court of Tennessee, in the case of *Maybe* v. *Baxter*, 11 Heisk. 682, 690, said: "The one is a determination of what the existing law is in relation to some existing thing already done or happened, while the other is a pre-determination of what the law shall be for the regulation of all future cases falling under its provisions."

As a member of, and in the convention which framed our Constitution, Judge BIDDLE said: "What is the legislative power? It is that power by and through which a State makes it laws. * * * The General Assembly has no other duty or power than to *make* laws. After a law has been enacted this department has no further power over the subject. It can neither adjudge the law nor execute it."

So far as the legislative department settles, or may settle the State policy, it may properly be called the political department of the government.

The question upon which the relator, Smith, here seeks an adjudication, however, very clearly, is neither a political nor a legislative question. It is not what ought to be done as a matter of State policy, nor what manner of laws ought to be

passed for future cases, or as a rule of future action. It is purely a judicial question, involving the proper construction of the Constitution and the laws already in existence, upon the question of the term and the election of a Lieutenant-Governor. It is, therefore, not a question that belongs to the legislative or political department of the government as such.

If the Legislature has authority, either concurrent or exclusive, to decide the question, it is not because it is in the legislative department of the government, but because provisions of the Constitution, and statutes enacted in pursuance thereof, other than I have yet referred to, clothe that body with the extraordinary power, which is neither legislative nor political, but judicial. As we have seen, one of the co-ordinate branches of the government is the judicial.

It is ordained by section 1, of article 7, of the Constitution, R. S. 1881, section 161, that "The judicial power of the State shall be vested in a Supreme Court, in circuit courts, and in such other courts as the General Assembly may establish."

This is a general grant of all judicial power to the judicial department of the government, to the exclusion of the other departments, and with appropriate legislation in pursuance of the grant, carries into the courts for final adjudication all judicial questions, unless there are other constitutional provisions lodging judicial power, in certain cases, elsewhere.

The Constitution is the people's; they made it, and they are sovereign. They had the right to lodge the judicial power of the government, which they established, wherever they saw fit. And if we shall find that from the general grant of judicial power to the judicial department, they have, by the same Constitution, carved out a certain portion as to certain cases, and lodged it elsewhere, there is no choice for the courts but to respect and to give force and effect to what they have done, whatever may have been the preconceived notion of the individual judges as to the existence or the propriety of such special grant.

Section 4, of article 5, of the Constitution, provides that " The returns of every election for Governor and Lieutenant-Governor shall be sealed up and transmitted to the seat of government, directed to the Speaker of the House of Representatives, who shall open and publish them in the presence of both Houses of the General Assembly."

Section 5, of the same article, provides that " The persons, respectively, having the highest number of votes for Governor and Lieutenant-Governor shall be elected ; but in case two or more persons shall have an equal, and the highest, number of votes for either office, the General Assembly shall, by joint vote, forthwith proceed to elect one of the said persons Governor or Lieutenant-Governor, as the case may be."

Section 5521 of the statutes, R. S. 1881, provides that the Governor and Lieutenant-Governor shall each take an oath of office in the presence of both Houses of the General Assembly in convention, and that the same shall be entered upon the journals thereof.

The two Houses thus canvass the votes for Governor and Lieutenant-Governor, not because they constitute the legislative department of the government, nor because the duties are legislative, but because the Constitution imposes the duty, and clothes them with the power in the way of a special grant.

In my judgment, by the Constitution, the two Houses are constituted a special tribunal, in the nature of a board of canvassers, to open and publish the returns of the votes for Governor and Lieutenant-Governor.

And I do not think that the grant is any broader, simply because it is to the two Houses. I think that in the same words, the grant would have carried with it just as much authority had it been to the State officers, constituting them a special tribunal to canvass the votes for Governor and Lieutenant-Governor, and to make a record of the result. Would such a grant constitute the State officers a judicial tribunal, in such a sense as that their determination upon the returns

before them would be conclusive as to the validity of the election, and as to the election of the persons declared elected Governor or Lieutenant-Governor?

It is not the publishing of the votes by the Speaker of the House, nor his declaration of the result, that makes the persons voted for Governor or Lieutenant-Governor, but the number of votes received. So the Constitution declares.

Does the grant of power to the two Houses to publish the returns and declare the result, constitute them a judicial tribunal in such a sense as that their determination, and declaration upon the returns before them, are conclusive as to the validity of the election, and as to the election of the persons declared to be elected? I think not. I think that the action of the two Houses in publishing the returns, and in declaring the results, is purely ministerial. They declare the result upon the returns before them, but back of that, there may be a sufficient number of illegal votes to change the result, and the majority candidate may be ineligible. No authority seems to be given to the two Houses, when thus in joint convention, to summon the interested parties before them, to send for, or to examine witnesses as to the illegality of votes, or as to the ineligibility of the persons voted for.

In the State of Wisconsin, the Attorney General, the Secretary of State, and the State Treasurer were by statute constituted a board of State canvassers. As such board, they had the authority, and it was made their duty, "'upon the certified statements of elections, made by the board of county canvassers, to examine and make a statement of the whole number of votes given at any such election for the offices of Governor, Lieutenant-Governor, Secretary of State,' etc., * * to certify such statements to be correct, and 'thereupon' to determine the result."

It was held by the Supreme Court of that State, that the duties were not judicial, but purely ministerial. *Attorney General, ex rel.*, v. *Barstow*, 4 Wis. 567 (781). In that case,

the proceeding was an information in the nature of *quo warranto*, to oust from the office a person who was claiming to be Governor by virtue of an election, and who had been declared elected by the board of State canvassers.

It was contended by Mr. Carpenter, with great ability, learning and research, that the suit could not be maintained: *First*. Because the determination of the board of State canvassers was final; and, *Second*. Because it would be an unwarranted interference with the executive department by the judicial department of the government.

The argument was answered by the court's holding, that the board was not a judicial tribunal, and that the proceeding was not to affect the executive department, but to oust a person who had wrongfully intruded into the office of the Chief Executive. See the comments of Cooley on that case. Cooley Const. Lim. (5th ed.) 624. See to the same effect, also, *Dickey* v. *Reed*, 78 Ill. 261; *Gass* v. *State, ex rel.*, 34 Ind. 425.

Clearly, a proceeding by information against a usurper into an executive office, is not an encroachment upon the executive department of the government.

It has been frequently held by this court, that the judiciary may control executive action as to matters purely ministerial. *Governor* v. *Nelson*, 6 Ind. 496; *Biddle* v. *Willard*, 10 Ind. 62; *Baker* v. *Kirk*, 33 Ind. 517; *Gray* v. *State, ex rel.*, 72 Ind. 567 (577).

And yet this court has steadily maintained the independence of the co-ordinate departments of government, refusing to yield its jurisdiction, and refusing to exercise functions belonging to the legislative or executive departments. *Lafayette, etc., R. R. Co.* v. *Geiger*, 34 Ind. 185 (196); *Butler* v. *State*, 97 Ind. 373; *Johnson* v. *Board, etc.*, 107 Ind. 15 (24), and cases there cited; *Columbus, etc., R. W. Co.* v. *Board, etc.*, 65 Ind. 427; *Shoultz* v. *McPheeters*, 79 Ind. 373.

The record of the canvass by the two Houses, of the declaration of the result, and of the oath, is doubtless *prima*

*facie* evidence of the election of the persons declared to be elected Governor or Lieutenant-Governor, just as the certificate of election, and the commission issued to other officers, are *prima facie* evidence of their election.

In a collateral proceeding, such record is, doubtless, conclusive evidence of the election, but it is not conclusive in a direct proceeding, authorized by the Constitution and laws; and especially is it not conclusive, as to whether or not there was a valid election under the Constitution and laws. As to the force of decisions by boards of canvassers, and of certificates of election and commissions, see Cooley Const. Lim. (2d ed.) 623; *State, ex rel.,* v. *Shay,* 101 Ind. 36; *O'Ferrall* v. *Colby,* 2 Minn. 180; *Prince* v. *Skillin,* 71 Maine, 361 (36 Am. R. 325).

If the Constitution contained no provision upon the subject under discussion, other than those so far examined, I am satisfied that a claimant for the office of Governor or Lieutenant-Governor would have a right, under existing statutes, to go into the courts and contest the validity of the election of the person declared elected by the two Houses. And especially am I satisfied that the law-officers of the State, moving in behalf of the people, would have such a right. McCrary Elections (2d ed), section 264.

Each House is the judge, and the exclusive judge, of the election and qualifications of its members. That right they get partially from the Constitution, and partially from the usages and laws of parliamentary bodies. But the right thus acquired has no application to the Lieutenant-Governor, because he is not a member of either House.

The Constitution assigns to him certain duties, as President of the Senate, but that does not make him a Senator, or a member of that body, in such sense as that the Senate may pass upon his election and qualification as a member. See *Winter* v. *Thistlewood,* 101 Ill. 450.

There is, however, another provision of the Constitution, which, in my judgment, enlightened by much research, and

the best thought I have been able to give to the subject, is controlling and conclusive against the right of the relator, Smith, to maintain this action.

The conclusion which I have been constrained to reach, I may say, is not in accord with my first impressions. The provision of the Constitution to which I refer is section 6, of article 5, R. S. 1881, section 132, and is as follows: " Contested elections for Governor or Lieutenant-Governor shall be determined by the General Assembly, in such manner as may be prescribed by law."

That section, without doubt in my mind, invests the General Assembly with judicial power to hear and determine contested elections for Governor and Lieutenant-Governor, and to the extent, and no further, that such powers are thereby granted, they diminish the general grant of judicial powers to the judicial department proper.

The clause, " in such *manner* as may be prescribed by law," had no reference to the grant of power. It neither enlarges nor lessens the grant. It has reference only to the manner or mode of executing the powers granted. The power thus granted to the General Assembly can not be augmented or abridged by legislation, nor by a failure of legislation. The statute provides, that the election of any person declared elected by popular vote to a State office, may be contested by any elector who was entitled to vote for such person.

It also provides, that such contest shall be tried before a committee of seven, chosen from each House of the General Assembly; that the committee shall report their judgment in the premises to both branches of the General Assembly; that it shall be entered on the journals of the respective Houses, and shall be conclusive. R. S. 1881, section 4746, *et seq.*

Section 4756, of the statutes, specifies certain causes as grounds of contest. That the election was without constitutional and statutory authority, is not specified as one of such causes. If, however, in the case before us, the election for Lieutenant-Governor in November last was without consti-

tutional authority, the respondent, Robertson, has no right to the office.

The infirmity in his title to the office, in such case, would arise out of the invalidity of the election. And as such invalidity, if it exists, is to be determined by an examination of the Constitution and the statutes, I think it might be assigned as a cause of contest, although it is not specifically named in the above section of the statute as such cause. But as said by NIBLACK, J., to concede that the invalidity of the election is not specified in the statute as a cause of contest, and that to be made available it must be there specified, would not change the matter.

The Constitution creates the General Assembly the exclusive tribunal for the determination of contested elections for Governor and Lieutenant-Governor. It remains such exclusive tribunal, whatever be the character of the legislation as to causes and mode of procedure, or whether there is any legislation at all upon the subject. The jurisdiction of that tribunal, being established by the Constitution, can not, as I have said, be changed by legislative enactment.

The statute, as we have seen, establishes the General Assembly a tribunal for the trial and determination of contested elections for other State offices. The jurisdiction to try contested elections for such other offices, being conferred by statute, may be limited by the statutes which confer it, or by other statutes. As to such contests, the statutes may confer upon the courts concurrent jurisdiction in a like or different mode of procedure. That, as we shall see, has been done in this State.

It is argued by counsel, that the case before us, instituted by the relator, Smith, is not a case of contested election, nor in the nature of such a proceeding. Clearly, this is a contest over an office. The relator asserts his rights as President of the Senate, and seeks to have those rights settled in this contest with the respondent. He asserts that the respondent was elected Lieutenant-Governor at a general elec-

tion in November, but is not Lieutenant-Governor, because that election was without authority. His success, upon his theory, depends upon the question as to whether or not that election was valid or invalid. The respondent, as stated in the complaint, claims that by virtue of that election, he is Lieutenant-Governor, and, as such, entitled to preside over the Senate. That claim the relator contests, or, to use the definition of the word "contest," that claim he "calls in question," "contends against," "controverts," "disputes," "opposes," "resists," and seeks to "litigate" in this proceeding. He is "calling in question," "contending against," "controverting," "disputing," "resisting," "contesting" the election of the respondent to the office of Lieutenant-Governor.

To say that the election through which the respondent claims was without authority, that for that reason there was no election, in the eye of the law, and that, therefore, the relator is not contesting, or seeking to contest an election, will not do. Whether or not there was a valid election, is the very question in contest. The relator's complaint shows that the respondent is claiming to have been elected Lieutenant-Governor at the last general State election; that that election was in all regards conducted according to the forms of law, and that the respondent received a majority of the votes cast for Lieutenant-Governor. His election to the office, however, is disputed, contested, on the ground that the election for Lieutenant-Governor was without authority—in violation of the Constitution.

An examination of the statutes under which this proceeding was instituted, will show that the proceeding is, and must be, a contest for an office, and, when an election is involved, a contest of that election. So far as material here, that statute is as follows:

Section 1131, R. S. 1881. "An information may be filed against any person * * in the following cases : *First.* When any person shall usurp, intrude into, or unlawfully hold or

exercise any *public office* or any franchise within this State, or any office in any corporation created by the authority of this State." ·

Section 1132. " The information may be filed by the prosecuting attorney in the circuit court of the proper county, upon his own relation, whenever he shall deem it his duty to do so, or shall be directed by the court or other competent authority, or by any other person on his own relation, whenever he *claims* an *interest in the office,* franchise, or corporation which is the subject of the information."

Section 1134. " Whenever an information shall be filed against a person for usurping an office, by the prosecuting attorney, he shall also set forth therein the name of the person rightfully entitled to the office, with an averment of his right thereto ; and when filed by *any other* person, he shall show *his interest* in the matter ; and he may claim the damages he has sustained."

Section 1136. " In every case *contesting the right to an office,* judgment shall be rendered upon the *rights of the* parties and for damages the relator may show himself entitled to, if any," etc.

Section 1137. " If judgment be rendered in favor of the *relator, he shall proceed to exercise the functions of the office,* after he has been qualified as required by law ; and the court shall order the defendant to deliver over all the books," etc.

Section 1141. " Whenever any person shall be found guilty of any usurpation of, or intrusion into, or unlawfully exercising any office * * within this State, * * * the court shall give judgment of ouster against the defendant, and exclude him from the office," etc.

Section 1144. " When an information is filed by the prosecuting attorney, he shall not be liable for costs ; but when it·is filed upon the relation of a private person, he shall be liable for costs, unless the same are adjudged against the defendant."

There are no italics in the above statutes, as printed ; they

are used here to direct attention to certain portions which I regard as important in this case.

Under that statute, when any person shall intrude, etc., into a public office, an information may be filed by the prosecuting attorney upon his own relation, or by any other person, " whenever he claims an interest in the office." He must show his interest in the office. " In every case contesting the right to an office," judgment shall be rendered " upon the rights of the parties." " If judgment be rendered in favor of the relator, he shall proceed to exercise the functions of the office."

Other statutes provide for contesting elections for county, township and city offices. In some instances, special tribunals are created. These statutes also prescribe a mode of procedure. R. S. 1881, section 4758, *et seq.*

The tribunals thus created, as well as the tribunal for the determination of contests in the case of State offices, other than Governor and Lieutenant-Governor, are statutory, and, as I have said, the authority which created them may give the courts concurrent jurisdiction.

It has often been contended in this State, that the special and statutory tribunals for the determination of contested elections have exclusive jurisdiction, and that such contests can not be determined in a proceeding by information. The contention has always been disregarded, and it has been held that the election of all officers (except for Governor and Lieutenant-Governor, as to which there has been no adjudication) may be contested and determined in a proceeding by information. Those holdings were rested upon the ground that the tribunals for the trial of such contests were statutory, and not constitutional, such as the tribunal established by the Constitution for the determination of contested elections for Governor and Lieutenant-Governor.

It has uniformly been held, too, that in order that a private person may prosecute a proceeding by information, he must show that he has an interest in the office. When he

has shown this, he may, in that proceeding, contest the election of the adverse claimant, if he claims through an election. And when the claim of the adverse claimant is, that he is entitled to the office by virtue of an election, the contest waged by the relator, although in the form of a proceeding by information, is, in every practical sense of the term, a contest of an election. The election relied upon by the adversary in such case, is contested, and for all practical purposes, the proceeding is one of contested election. See *State, ex rel.,* v. *Shay,* 101 Ind. 36, and cases there cited; *State, ex rel.,* v. *Adams,* 65 Ind. 393.

In the case last above, it was said: "This court has frequently held that the right to an office may be contested by an information, during the time the statute for contesting elections was in force." See, also, *Reynolds* v. *State, ex rel.,* 61 Ind. 392; *State, ex rel.,* v. *Gallagher,* 81 Ind. 558; *Elam* v. *State, ex rel.,* 75 Ind. 518; *Gass* v. *State, ex rel.,* 34 Ind. 425.

It is not necessary to a contested election that both parties shall have been voted for at the election. Any citizen qualified to vote at the election may be a contestor. R. S. 1881, section 4743.

We must judge of the nature of the relator's case by the facts he states in his complaint. He does not claim to be Lieutenant-Governor, but he does claim that as President *pro tempore* of the Senate, he has the right to perform the duties which belong to the office of Lieutenant-Governor. To that extent, he claims to have an interest and right in the office of Lieutenant-Governor. That right he asserts against the respondent. And, as I have said, he shows in this complaint, that the respondent received the majority of the votes of the electors of the State, at the general election in November last, for the office of Lieutenant-Governor; that the election was in all things regular, and that the respondent claims to have been, and was, elected to that office, if the election was authorized by the Constitution. He contests

the respondent's claim upon the ground that the election was invalid, being without constitutional sanction. He contests the election. The controversy is purely a private one, between the relator and the respondent.

The end sought is an adjudication that the respondent was not elected Lieutenant-Governor, and hence is not entitled to preside as President of the Senate, and that, therefore, the relator is entitled to preside as President of the Senate, having been duly elected to that position.

This is not a case where there has been no election at all. Whatever may be said as to the constitutionality of the election, the respondent comes into the contest through an election at which all the people voted.

Although not in name, in my judgment, this is a proceeding to contest the election of the respondent to the office of Lieutenant-Governor. The relator is thus waging a contest in the courts, which by the Constitution belongs exclusively to another forum. It must be waged and settled before the General Assembly. That tribunal alone has jurisdiction of the subject-matter.

It has exclusive jurisdiction, too, over everything that pertains to the controversy, both of law and fact. See *People, ex rel.,* v. *Mahaney,* 13 Mich. 481.

There is no partition of the jurisdiction, giving to the General Assembly authority to determine the questions of fact, and to the courts authority to determine the law in the same case.

If the tribunal created to determine contested elections for Governor and Lieutenant-Governor were established by statute, and not by the Constitution, the relator might avail himself of the proceeding by information, as here attempted. The tribunal being established by the Constitution, he must seek his remedy in that tribunal.

This conclusion is fully sustained by the authorities cited by ELLIOTT, C. J., and which I need not cite here at length.

*State, ex rel.,* v. *Baxter,* 28 Ark. 129; *Baxter* v. *Brooks,* 29 Ark. 173.

It has been held in some of the States, that when special tribunals are established by statute for the determination of contested elections, their jurisdiction is exclusive, as against any proceeding by information in the courts, on the part of a claimant to the office. *Commonwealth, ex rel.,* v. *Baxter,* 35 Pa. St. 263; *Commonwealth, ex rel.,* v. *Leech,* 44 Pa. St. 332; *State, ex rel.,* v. *Marlow,* 15 Ohio St. 114.

It does not result from the holding, that the courts have not jurisdiction of the subject-matter of this controversy, that the parties are without remedy. They have open to them the tribunal ordained by the Constitution of the State.

It ought to be presumed, that that tribunal is a capable and impartial one. The fathers had sufficient faith in it to establish it. We must respect their work, and trust it.

Possibly, it might have been better to have lodged in the judicial department of the government the jurisdiction to try contests involving the chief executive offices of the State.

However that may be, we must take the Constitution as we have received it, and yield obedience to its several provisions until they may be changed, if change is desirable.

What I have said in the foregoing, is with strict reference to the precise case before us.

Where there has, in fact, been an election, as in the case before us, and one of two persons claims an office through such an election, and another, disputing such an election, claims an interest in the same office, or its duties and emoluments, they must settle that contest in the tribunal established by the Constitution, and can not settle it in the court in a proceeding by information.

When we have determined that the court below was without jurisdiction, we have determined that its orders and judgments, whatever they were, must be reversed.

I do not say, that in no case can the courts, in a proceeding by information in the nature of *quo warranto,* upon the rela-

tion of the proper law officer, oust from the office of Governor or Lieutenant-Governor, a wrongful intruder and usurper. That question is not before us. I may add, that there is a very marked difference between a proceeding by information, instituted by private persons, and a proceeding by information in the nature of *quo warranto,* upon the relation of a public prosecuting attorney. In the one case, the private person seeks to settle and protect private rights in a public office; in the other the officer moves in behalf of the sovereign people. See the following cases: *Reynolds* v. *State, ex rel.,* 61 Ind. 392 (403); *People* v. *Holden,* 28 Cal. 123; *Commonwealth* v. *Burrell,* 7 Pa. St. 34; *Hesing* v. *Attorney General,* 104 Ill. 292; *Vogel* v. *State, ex rel.,* 107 Ind. 374.

Filed Feb. 23, 1887.

## ON PETITION FOR A REHEARING.

ELLIOTT, C. J.—It is not necessary to again discuss the questions considered in our former opinion, but there is one point made in the brief on the petition for a rehearing, which, perhaps, requires notice. It is said: "The injunction was granted by a judge in vacation whose jurisdiction depended not upon the summons in the case, but on the notice and service thereof, which notice and service thereof are not questioned." From this premise, counsel reach the conclusion that jurisdiction could not be challenged by a verified answer. This is a novel doctrine, for it impliedly assumes that the powers of a judge in vacation are greater than those of a court in term; whereas, as is well known, the powers of a court in term are very much greater than those of a judge in vacation. It surely needs no argument to prove that a judge in vacation can not have a greater jurisdiction than a court in term. The counsel's position is untenable for another reason, and that is this: It tacitly assumes that the plea did not fully challenge the jurisdiction of the court, when, in fact, the plea did deny the jurisdiction of the Ma-

rion Circuit Court to proceed at all in the case. The injunction, as counsel asserted over and over again in argument, was a mere ancillary proceeding, and, certainly, where there is no jurisdiction of the person as to the principal, cause of action, there can be none over a mere auxiliary proceeding wholly dependent upon the principal cause. There is yet even a stronger reason against the position of counsel, for, as all the members of the court agree, there was no jurisdiction of the subject-matter of the action so far as it sought an injunction, so that acts done in that branch of the case by the relator could not possibly confer jurisdiction of the person of the appellant.

The question of jurisdiction was the first question for decision, and of this question there were two branches: *First.* Whether the court had jurisdiction of the subject-matter. *Second.* Whether the court had jurisdiction of the person.

The formal grounds of the judgment of reversal were, that the action was not brought in the proper county, and that the circuit court had no jurisdiction to issue the injunction, and upon those points all of the judges agreed. Upon the other branch of the question of jurisdiction, that is, jurisdiction of the subject-matter, there was a diversity of opinion. The majority agreed in holding that in this case the court had no jurisdiction of the subject-matter; but, as to the line of reasoning by which that conclusion was reached, they did not in all things agree. All of the members of the court regarded the question of the jurisdiction of the subject-matter as before the court for decision, and, as two of the judges were of the opinion that the court had jurisdiction, while the other judges thought otherwise, it was deemed proper by the court that each of the judges should submit his individual views upon that branch of the question. Judges MITCHELL and HOWK expressed opinions upon the question as to the rights of the parties respecting the office in controversy, because they regarded a decision of that question as essential to a decision of the question of jurisdiction; but the

majority declined to express any opinion upon that question, for, in their judgment, their power was exhausted and their duty done when they affirmed that there was no jurisdiction.

Petition overruled.

Filed March 11, 1887.

## INDIVIDUAL OPINION.

NIBLACK, J.—As the petition for a rehearing brings this case again before us for such further consideration as we may feel it to be our duty to extend to it, I avail myself of the opportunity of adding something to the individual views I expressed at the former hearing. I am induced to adopt this course partly on account of the prominent relations which the cause has been made to sustain towards current public affairs in the State, and partly on account of the misapprehension which seemingly exists in the minds of many persons as to the reasons which restrained a majority of the members of this court from the expression of any opinion upon the actual merits of the controversy which caused the institution of this suit.

In the views which I formerly submitted I discussed and expressed an opinion upon some matters which were only incidental and collateral to the question of jurisdiction I was then considering. Such merely incidental and collateral matters were referred to and commented upon as illustrative of the peculiar nature of the contest then being waged between the appellant and the relator, Smith, and as, at least, indirectly sustaining my position that the courts of the State were utterly without jurisdiction over the subject-matter of that contest, and for no other purpose.

The main features of the contest which followed the Presidential election, held in the year 1876, have become a matter of history, and are, hence, within the reach, and in consequence presumably within the common knowledge, of all. The Electoral Commission created to assist in the settlement of that contest was not in any proper view a judicial tribu-

nal.    Its duties were kindred to those of a referee in a judicial proceeding.    It was authorized to examine and to report to Congress upon certain questions referred to it, without trenching upon the right of the two Houses of Congress to ultimately decide who, if any one, had been elected either President or Vice-President of the United States.    It was organized upon the accepted theory that the final decision as to who had been so elected rested ultimately with Congress, and could not, under the Constitution of the United States, be delegated to any other tribunal, and that, consequently, whatever such electoral commission might report, or recommend, would be in its nature advisory only.

Congress acted upon that theory when the commission reported, and the evidence of title which Mr. Hayes thereafter received was made to rest, and still rests, upon the subsequent action of Congress, which in its effect declared him to have been duly elected.    During the continuance of the contest, some of the friends of Mr. Tilden, becoming discouraged with the prospect of obtaining a favorable decision otherwise in his behalf, inaugurated a movement to have Congress pass an act conferring jurisdiction over all the matters in dispute upon some court of the United States, and authorizing such court to determine all questions of title arising out of the conflicting claims of the contestants.    But after considerable debate, and very general consultation, an informal, but none the less final and decisive conclusion was reached by those feeling themselves most interested, that the contest was, in all its essential features, a political contest, the decision of which the Constitution had devolved exclusively upon the two Houses of Congress, and that, consequently, Congress could not convert it into a judicial question, and confer upon a court the power to hear and to finally determine it.

The conclusion, thus informally reached, has since been generally accepted and acquiesced in by the country, as the more recent debates in Congress on the subject will fully

establish. Moved and quickened by the events attending that remarkable contest, Congress has, within the past few months, enacted a law specifically providing for the manner in which all contests concerning the election of either President or Vice-President shall hereafter be settled by the two Houses of that body, and the exclusive power of Congress to determine all such contests will probably never again be considered an open question.

If any person will take the trouble to compare the several sections of our State Constitution having reference to the election and induction into office of Governor and Lieutenant-Governor, with the corresponding provisions of the Constitution of the United States concerning the election and induction into office of President and Vice-President, he will readily perceive that all matters in any manner affecting the election and title of Governor or Lieutenant-Governor, are more expressly conferred upon the General Assembly than are similar matters touching the election and title of President and Vice-President devolved upon Congress.

As to some features of the difference between a political and a judicial controversy, see the case of *Luther* v. *Borden*, 7 How. U. S. 1.

I have, therefore, believed from the first, and further investigation has ripened that belief into an imperative conviction, that the court below did not have, and that neither it nor any other court of the State could, under the Constitution, have conferred upon it, jurisdiction over the question as to whether any person has been lawfully elected Governor or Lieutenant-Governor. The consequent impropriety of any member of this court, who had reached the same or a similar conclusion, expressing an opinion as to whether the appellant holds a valid claim to the office of Lieutenant-Governor, and thus endeavoring to forestall and to control the action of the General Assembly, which alone, as we believe, has power to decide the question, appears to me to be too manifest to require extended comment. If this court, in com-

mon with the other courts of the State, has no jurisdiction over the subject-matter of the appellant's claim to office, then any opinion we might give, however unanimously, on the subject-matter of that claim, could be at most only advisory. But this court is neither required nor authorized to give merely advisory opinions. The Attorney General is the law officer of the State provided for that purpose. He is charged with the duty of giving advisory opinions at the request of the Governor, or any other State officer, or of either House of the General Assembly. R. S. 1881, section 5667.

The late Attorney General, several months before the last general election, gave an advisory opinion that there was then a vacancy in the office of Lieutenant-Governor, and that the vacancy was one which could be filled at that election.

The State Senate, acting upon its own judgment, as it had the power to do, and in accordance with the independent views of a majority of its members, came to a conclusion entirely adverse to that reached by the Attorney General, and proceeded with the business of the session accordingly. If this court, whether acting unanimously or through a majority of its members only, had, at the former hearing, assumed to decide, notwithstanding our announced want of jurisdiction over the question, in accordance with the opinion given by the Attorney General, our decision would have afforded the Senate no authoritative reason for changing the line of policy which it had adopted, and we have no assurance that, under the circumstances, any such a change of policy would have resulted. On the contrary, if, acting as above, we had assumed to decide that the alleged election of the appellant was invalid, our decision would not have bound the House of Representatives, which from the first recognized the appellant as the lawfully elected Lieutenant-Governor. Such a decision would doubtless have been treated by that body as an intrusion upon its exclusive authority as a co-ordinate branch of the General Assembly. Thus, whatever opinion

we, of the majority, might have announced, would, in the very nature of the controversy, have become a new cause of exasperation between the two Houses, and would have tended to crystallize more firmly the disorganization which already existed between them.

It was, as it seems to me, unreasonable to expect that, in a most exciting political crisis like that through which the General Assembly has just passed, and in relation to a most important and momentarily overshadowing question, the opinion of an Attorney General, or the voluntary, extra-judicial and merely individual views of any judge, or set of judges, would have been accepted as a finality by those representing adverse interests, or holding radically different views.

Then, too, the promulgation of any majority opinion upon the merits would have needlessly connected this court with an exciting and bitter political controversy, which it had no power to control, or even to mitigate in the smallest degree. Those of us who think we have no power to pass upon the appellant's title, ought certainly not to have been expected to go out of our way to give it moral support on the one side, or to merely besmirch it on the other.

As to those of our number who believe the courts of the State have jurisdiction over the subject-matter of this proceeding, there was an evident propriety in their expressing their views on the merits of the contest for the information of those most interested, as well as for that of the inferior courts; but for those of us who maintain an entire want of jurisdiction, common consistency enjoined a discreet and respectful silence upon the merits. It would certainly not be consistent for this court to first hold that jurisdiction of a cause, inadvertently before it, belonged exclusively to the Supreme Court of the United States, and then, notwithstanding, to proceed to decide it upon its merits. Such a decision would settle nothing, and could, hence, do no practical good, and might mislead and do positive harm. When, therefore, to speak may mislead, silence ought to be carefully observed.

In my view, there is nothing we can proclaim either as to the official or non-official *status* of the appellant which the General Assembly may not, at any time, when in session, overrule, and when we should be so overruled it would be our duty to acquiesce, however damaging it might be to our consistency or to our authority as a court.

If an act of the present General Assembly, whether passed at the regular or some special session, shall come before us, signed by the appellant on behalf of the Senate, and otherwise duly certified and approved, it will be our duty to assume that the appellant was, at the time he affixed his signature, the acting and qualified Lieutenant-Governor of the State, and that he had been so recognized by the two Houses of the General Assembly. On the other hand, when an act of the current General Assembly shall come before us, signed by the relator, Smith, or some other person, as President *pro tempore* of the Senate, we will be required to assume that the person so signing was elected to preside over the Senate at a time, and under circumstances, which authorized his election. So that the Senate settles for us, and not we for it, who, for any occasion, is its proper presiding officer.

The Constitution plainly contemplates a concurrence of action between the two Houses in all matters which pertain to the organization of each, as well as in those things which require the joint action of both, but when the two bodies fail to concur, each must necessarily determine for itself everything that relates to its own organization. No means are provided by our scheme of State government by which unity of action between the two Houses can be constrained, or either House coerced, to act against its will. There is no appeal from what either House may do, except to the people through the medium of the ballot-box.

The executive department may aid in preserving the public peace, but nothing more.

It is due to frankness to state that, believing as I have from the first that the courts of the State have positively

nothing to do with the validity or invalidity of the appellant's title, I have never examined the questions made concerning it with that care which would enable me to promulgate an opinion on the subject worthy of the occasion, or by which I might hereafter be willing to be bound in the light of future events. I have so far refrained, and I expect to continue to refrain, from the formal expression of any opinion in that respect, which might be urged against, or brought into conflict with, any action which the General Assembly may have taken, or may hereafter take, in regard to the appellant's claim to official recognition. As a citizen and a member of a co-ordinate branch of the State government, I stand ready to acquiesce in whatever action, if any, that body shall at any time take on the subject.

If the disorganization which has so far existed shall continue to the end, I can then only regret what I, in common with others similarly situated, have no power to relieve.

Filed March 11, 1887.